[Crim. No. 21944. May 9, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
HARVEY LEE HEISHMAN III, Defendant and Appellant.

COUNSEL

Geoffrey Rotwein, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Herbert F. Wilkinson, Martin S. Kaye, Ann K. Jensen and Dane R. Gillette, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KAUFMAN, J.—Defendant Harvey Lee Heishman III was convicted, after jury trial, of the first degree murder of Nancy Lugassy, with the special circumstance that she was a witness to a crime who was intentionally killed to prevent her testimony. (Pen. Code, §§ 187, 189, 190.2, subd. (a)(10).)[1] He was also found to have personally used a firearm in committing the crime. (§ 12022.5.) The jury subsequently returned a verdict for imposition of the death penalty; defendant's motion for new trial and automatic application for modification of the verdict were denied, and he was sentenced to death. (§§ 190.3, 190.4.) This appeal is automatic. (§ 1239, subd. (b).)

We conclude that the judgment of guilt and the special circumstance finding should be affirmed. Moreover, we find no error in the penalty trial requiring reversal of the verdict imposing the death penalty. It is clear that on defendant's automatic application for modification of the penalty verdict, the trial judge failed to comply with the requirement of section 190.4, subdivision (e), that the judge "state on the record the reasons for his findings" and "set forth the reasons for his ruling on the application and direct that they be entered on the clerk's minutes." However, we conclude that the omission does not require remand in the circumstances of this case. Accordingly, we shall affirm the judgment in its entirety.

GUILT PHASE EVIDENCE

The trial to determine guilt took place in November 1980. Defendant was charged with murdering Lugassy to prevent her testifying in a criminal

---

[1] All section references are to the Penal Code unless otherwise indicated.

proceeding that had been brought against him for raping her. She lived in a cottage at the rear of a lot on Portland Avenue in Oakland, near Lake Merritt. On July 22, 1979, about 11 p.m., she ran screaming to her neighbor's and said she had just been raped. On August 9, she unhesitatingly selected defendant's picture from a photo lineup. She continually expressed fear of him. On August 10, a complaint was filed against him on the rape charge. He was arrested, and on October 24 he pled not guilty. Preliminary hearing was set for November 20, and he remained at large on bail.

On November 1, 1979, between 8 and 8:30 p.m., Lugassy's neighbors heard shots. Some also heard screams. One placed the shots at 8:20 p.m. Police were called at 8:25 p.m. Two neighbors saw a Ford LTD speeding away with its lights off. Police, arriving at 8:35 p.m., found Lugassy's body in front of her home, with the door ajar. She was dead of three bullet wounds. In her purse was a subpoena for the preliminary hearing, and in her home was a residential security check form, used by Livermore (but not Oakland) police.

Because of Lugassy's death and thus, her unavailability as a witness, the rape charge against defendant was dismissed at the preliminary hearing on November 20. A woman who was with defendant and whose description matched Cheryl Miller, whose involvement in the crime is discussed later, expressed pleasure at the dismissal and made an affectionate gesture toward defendant.

On December 12, police interviewed defendant. He said he had met Lugassy in July 1979 in the Lake Merritt area and visited her home alone, but no sex occurred. He also said that he never owned a gun and that on November 1 he was at his apartment with Cheryl Miller, who arrived between 8 and 8:30 p.m. On December 16, Miller told police that on November 1 she was with defendant from 8 p.m. on.

On February 8, 1980, Nancy Gentry approached the police and gave information about the crime. As a result defendant was arrested, Gentry's Ford LTD was impounded, and Cheryl Miller, once told of police knowledge of a relationship between defendant and Gentry, recanted her support of defendant's alibi and gave information incriminating him.

Gentry and Miller provided the eyewitness testimony regarding the plot to kill and the actual killing of Lugassy by the defendant. Their extensive testimony is summarized.

Gentry testified that she met defendant on a beach in Alameda in August 1979. They had a sexual relationship and soon discussed marriage. In Au-

gust, September, and October, she made loans to him of $1,200, $3,000, and $2,500, to be used in his business. In mid-October he said he had been arrested. At first he said the arrest resulted from a bad check that Gentry had given him. Then he said he was being framed on a rape charge. Several conversations later, he asked her if she knew a "hit man." Later he asked her to find him a gun. She borrowed a .38 caliber pistol from Don Ewing, purchased ammunition, and gave it to defendant about October 21. He referred to Nancy Lugassy by name and said that he had a court date in November and feared going back to prison if she testified against him. He asked Gentry to call the Peralta College District to get Lugassy's class schedule; she did so without success.

Gentry further testified: On October 25, defendant introduced Cheryl Miller to her as his sister, Nancy. Using a Ford LTD that Lawrence Meehan had rented for Gentry, the three (defendant, Gentry, and Miller) drove around Laney College in Oakland and another Peralta campus in Berkeley, and past Lugassy's home, looking for Lugassy. On October 30, at defendant's request, Gentry again met him and Miller at his apartment in San Leandro. They drove past Lugassy's home; the lights were out. They went for coffee, then returned and parked on Van Dyke Street, where defendant walked up a driveway toward a fence that bordered on Lugassy's yard. Gentry and Miller remained in the car. Defendant was gone for an hour and returned at 10:30 p.m., indicating no one was at home. They all left. Next evening, October 31 (Halloween), the three again drove by Lugassy's home and saw the lights on. They parked at the same place on Van Dyke. Defendant disappeared down the driveway and was gone two or three hours. Thereafter they returned to defendant's apartment. At some point the three discussed planting drugs on Lugassy or in her home to set her up for arrest. Gentry saw a baggie of drugs in that connection.

Gentry's testimony continued. She, herself, proposed using the ruse of a police security check as a means of access to Lugassy. On November 1, about 6:30 p.m., Gentry picked up defendant at his apartment in her Ford LTD, and the two proceeded to Portland Avenue. Gentry was dressed in a blazer and skirt, so as to look professional, and she had a police security check form she had obtained from a Livermore Neighborhood Alert Program and a lock for use on a sliding glass door. Defendant and Gentry arrived at Lugassy's home about 7:30 and, seeing that the lights were on, parked on Portland, two houses down. As Gentry got out of the car, defendant handed her a small gun and told her to use it if she got the chance. She put it in her purse. She then went to Lugassy's door, identified herself as Sue Hill from the Oakland Police Neighborhood Alert Program, and was admitted. Lugassy filled out the form, and stated that she had been raped and a hearing was pending. After 15 minutes, Gentry departed, intentional-

ly leaving the security form and the lock in Lugassy's apartment. As they drove off, defendant told Gentry to lure Lugassy outside by pretending she needed help with her car. She left defendant at the driveway on Van Dyke Street and again parked on Portland. She walked back to Lugassy's cottage, picked up the lock, and asked Lugassy to help with her car. As they went through the yard, Gentry saw defendant standing against a utility shed, but Lugassy did not give any indication she saw defendant. Gentry and Lugassy got the car started; then Gentry dropped Lugassy off in front of her home, and proceeded on slowly with lights off. Almost immediately she heard a scream and three shots. She turned the car around, drove back to Van Dyke Street, and picked up defendant. He entered the car, removed his watch cap and false beard, and said, "Let's get out of here." They returned to his apartment, where he telephoned his father and said, "It's done." Gentry departed.

Finally, Gentry testified as follows: She saw defendant twice in the two months following the shooting: just before Thanksgiving and just before Christmas. Defendant was upset at her driving her Ford LTD to his apartment. When she phoned him on November 20 to ask how the preliminary hearing on the Lugassy rape charge had gone, he said not to call him because his phone might be tapped. He gave her his "sister's" (Miller's) number, which Gentry called and as a result learned that the rape charge against defendant had been dismissed.

Cheryl Miller also testified. She related she lived in Hayward with her mother and two children and met defendant in the summer of 1979. They dated and by September were engaging in occasional sexual activities. In early October she loaned him $500 he said he needed for his father's meat business. Shortly thereafter, defendant said he had been arrested on a rape charge. On October 25, at his apartment, he said he had been "set up" on the charge, and that the woman charging him would have to be killed because he would never go back to jail. He at first said the prior imprisonment had been for assault but later stated it had been for a rape charge on which he also had been "set up." Posing as his sister at defendant's request, Miller answered a phone call to him from Gentry. On October 26, at his apartment, defendant told Miller he and Gentry had once been lovers, and that the sister pose was to prevent Gentry from harming Miller. "Alan" (Saccheri) was present on this occasion but then left. (The testimony of Alan Saccheri is summarized hereinafter.) Gentry arrived, and Miller, Gentry and defendant then left defendant's apartment in Gentry's Ford LTD. Defendant said they were going by the home of his accuser to "check things out." They drove to Lugassy's home, then to Laney and Vista Colleges, then back to Lugassy's home, which was dark. Gentry left the car to walk past Lugassy's home. She had also gotten out at the colleges after defendant

said he wanted to find out if Lugassy was enrolled there. In the car there was discussion about killing Lugassy. Also, defendant suggested planting drugs in Lugassy's living quarters. Miller had with her, and handed to defendant, a baggie that belonged to Miller's mother containing prescription drugs and two marijuana cigarettes. The baggie was thrown away later in the evening. Next morning, October 27, Miller told defendant she wanted no further involvement, but he said she was already implicated.

Miller added to the chronology of events. On the morning of October 30, at defendant's request, she phoned Laney College or Vista College to ask if they had a nursing or sign-language program, in which defendant thought Lugassy might be enrolled. After making the calls and receiving no information, she told him there was no such program. That evening at his request she went to defendant's apartment. She saw him with his father; a large handgun passed between them. Gentry arrived and drove Miller and defendant to the Portland Avenue area. They parked on Van Dyke, and defendant went up a driveway. He returned 30 to 45 minutes later, stating he had climbed a fence and stood by a bush in Lugassy's yard. They went for coffee, returned to Portland Avenue, then returned to defendant's apartment a little after midnight. By now Miller really believed he intended to kill Lugassy. On October 31, the three again spent the evening in the Portland Avenue area, leaving after midnight. Defendant made two or three trips to Lugassy's cottage. He wore a fake beard, and a gun was stuck in his pants, with the handle visible. Miller spent the nights of October 30 and 31 at defendant's apartment. On the morning of November 1, she told him she would not return to Portland Avenue. He was upset. Lugassy was killed between 8 and 8:30 p.m. on November 1. That evening, about 9, defendant phoned and insisted that she come to his apartment immediately. When she arrived, defendant was in an unusually carefree mood.

Miller testified regarding the events from defendant's final court appearance in the rape case to her own meeting with the police. On November 20, at defendant's request, she accompanied him to the preliminary hearing on the Lugassy rape charge. He told her to call his father and a bail bondsman if he were jailed. After his release, he thought police were following them on the way back to his apartment. The day after Thanksgiving, she demanded that defendant repay her loans; he responded with threats. In December, at his request, she talked to Oakland Police Sergeant Murray and told him, falsely, she had been with defendant from 8 p.m. on November 1. She lied out of fear of defendant. On February 13, 1980, she was again questioned and told the truth only after learning that the police had talked to Gentry. She was not granted immunity until just before defendant's preliminary hearing on the present murder charge in April.

Other evidence showed as follows: Although the murder weapon was never found, the markings on bullets in Lugassy's body were consistent with those produced by a .38 caliber police special like one that Donald Ewing testified he loaned to Gentry and Gentry testified she gave to defendant in October 1979. Ewing and two other men testified to loaning or giving Gentry money that month.

Telephone company records showed calls between October 24 and 30 to the Peralta colleges from defendant's, Gentry's, and Miller's numbers, calls through November 1 from defendant to Gentry and to Miller, and calls between Miller and Gentry. Other evidence showed Lugassy was indeed taking nursing classes at Vista College of the Peralta District.

John Leal, a Livermore police officer, testified he had made a security check of Gentry's home and left her a copy of the form he used.

Defense witness Lawrence Mann testified he allowed the Ford LTD to be rented on his credit card and used by Gentry. After the car was impounded in February, Richard Lavin, Lugassy's neighbor, selected it from about 50 cars in a police garage as the car he had seen driving away five seconds after he heard the shots that apparently killed Lugassy.

Other defense witnesses, James and Millicent Stewart, each testified they had known Miller for 10 years and that in October 1979 Miller mentioned that defendant was going to kill, or have killed, a woman he was alleged to have raped. According to Mrs. Stewart, Miller also said that defendant had had Miller pose as his sister and that "Nancy" was going to commit a murder for defendant. Sometime in 1979, after Halloween, Mrs. Stewart received a phone call indicating "it had been done," which she assumed referred to the Lugassy murder she had read about in the paper.

Alan Saccheri, age 18, testified for the defense: He was with defendant when the latter gave Lugassy a ride about July 22, 1979. They all got something to eat, and as Lugassy was leaving, she invited defendant to her place for dinner. Saccheri was with defendant in July or August when he first met Gentry at the Alameda beach, and Saccheri later saw Gentry at defendant's apartment. Saccheri introduced defendant to Miller and was at defendant's apartment when defendant asked her to pose as his sister, and she was "more than willing" to do so. In December, according to Saccheri, Miller said that Gentry had killed Lugassy, and that on November 1 she (Miller) had spent the evening and night with defendant; in discussing this she indicated no fear of defendant.

Defendant's mother and sister provided partial alibis, testifying that on October 31 and November 1 defendant had been at their San Leandro home

until times ranging between 6:30 and 7:30 p.m. It was 12 miles between defendant's apartment and Lugassy's home. The distance could be driven in 14 to 18 minutes.

An abstract of judgment in evidence showed that in October 1975 defendant was committed to prison for attempted rape.

## I. ACCOMPLICE INSTRUCTIONS AS BAR TO FINDING THAT GENTRY INDEPENDENTLY KILLED LUGASSY

A theory of the defense was that Gentry killed Lugassy, acting on her own. That theory was said to be supported by: (1) a statement attributed to Miller that Gentry did the killing, (2) testimony of a neighbor that she heard the scream and three shots followed by footsteps toward the front (Portland Avenue), in contradiction to Gentry's testimony that defendant made his escape through the back toward Van Dyke Street, and (3) physical measurements and timed-test runs designed to show that the assailant must have fled toward Portland Avenue. (The prosecution presented rebuttal evidence of its own test runs and measurements.)

The jury instructions defined principals as including those who directly and actively commit the crime and those who aid and abet in its commission with knowledge of the unlawful purpose of the one who does directly and actively commit it (the perpetrator). As to accomplices, the jury was instructed: "An accomplice is one who is or was subject to prosecution for the identical offense charged against the defendant on trial. To be an accomplice, the person must have aided, promoted, encouraged, or instigated by act or advice the commission of such offense with knowledge of the unlawful purpose of the person who committed the offense." (CALJIC No. 3.10 (1979 rev.).) "[In the crime of murder,] [i]f the crime of [murder] was committed by anyone, the witness [Nancy Gentry] was an accomplice as a matter of law and her testimony is subject to the rule requiring corroboration." (CALJIC No. 3.16, bracketed words added by the court.)

■ Defendant argues that the jury was thereby directed to find that Gentry was an accomplice in the sense of one who assists another and was precluded from finding that she acted alone. We do not believe the jury could have so understood the instruction.

The instructions did not literally tell the jury it could not find Gentry was the killer. And Gentry was legally an accomplice "if the crime of murder was committed by anyone" including Gentry herself. CALJIC No. 3.16 was given to make clear that Gentry was being labeled an accomplice for purposes of the rule requiring corroboration if her testimony were believed. The

instruction could not reasonably be understood as precluding rejection of her testimony—including rejection based on a conclusion that in fact she was the killer. (*People* v. *Flanders* (1979) 89 Cal.App.3d 634, 640 [152 Cal.Rptr. 696].) Defendant's interpretation of the instruction would make it practically a direction of conviction. Yet the jury was fully instructed on the presumption of innocence and the prosecution's burden of proving guilt beyond a reasonable doubt.

Defendant's supplemental brief seeks to extend the asserted prejudicial effect of the accomplice instructions to the status of Miller, citing the prosecutor's closing argument that if the defense contention that Miller was an accomplice is correct, whom did she aid and abet other than defendant himself? But there is no evidence placing Miller at the scene on the evening of the murder; hence, if she was an accomplice, she was such only as an aider and abettor. Though the prosecutor argued that she aided and abetted defendant, nothing in the instructions precluded a defense argument that she aided and abetted someone else (the only other possible principal being Gentry).

## II. Inadvertent Omission of "Not" from Instructions on Burden of Proving Accomplice Status of Cheryl Miller

In the jury instructions, after defining accomplice status and explaining its consequences (testimony requires corroboration and is to be viewed with distrust), the court proceeded to give CALJIC No. 3.19 with respect to Cheryl Miller. That instruction, if stated properly, would have read as follows: "You must determine whether or not the witness Cheryl Miller was an accomplice as I have defined that term. The defendant has the burden of proving by a preponderance of the evidence that Cheryl Miller was an accomplice in the crime charged against the defendant. Preponderance of the evidence means such evidence as when weighed with that opposed to it has more convincing force and the greater probability of truth. In the event that the defendant has not proved by a preponderance of the evidence that Cheryl Miller is an accomplice or the evidence is evenly balanced so that you are unable to say that the evidence on either side of the issue outweighs the other, then you must find that Cheryl Miller was not an accomplice."

In delivering this instruction, the judge omitted the first "not" from the last sentence, so that it said, "In the event that the defendant *has* proved by a preponderance of the evidence that Cheryl Miller is an accomplice . . . , then you must find that Cheryl Miller was not an accomplice." (Italics added.)

The Attorney General concedes this was error but argues it was harmless. He is correct. ■ Prejudice from failure to give proper accomplice

instructions is measured by the test of *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], i.e., whether it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error. (*People* v. *Mayberry* (1975) 15 Cal.3d 143, 159-160 [125 Cal.Rptr. 745, 542 P.2d 1337]; *People* v. *Gordon* (1973) 10 Cal.3d 460, 470 [110 Cal.Rptr. 906, 516 P.2d 298].)

First, it is likely the instruction was understood to mean what it should have said. Having just been told the defendant had the burden of proving by a preponderance of the evidence that Miller was an accomplice, the jury would not likely accept at face value the statement that if the defendant has met that very burden, they must find that Miller was not an accomplice. Both sides in closing argument had stated that the defendant had the burden of proving Miller an accomplice, the prosecutor arguing that the burden had not been met, and the defense arguing that it had. Clearly defense counsel did not realize that the instruction had been misstated by the court; counsel argued on motion for new trial that Miller was an accomplice as a matter of law without mentioning the error.

Though we decline to treat this unlikelihood of the jury's being misled as conclusive, we weigh it in the balance in concluding, as we do, that the instructional error was harmless under *Watson, supra,* 46 Cal.2d 818, 836. The utmost effect of the error would have been an erroneous finding that Miller was not an accomplice. Even if the jury, absent the error, would have found that Miller *was* an accomplice and that they therefore were barred from using her testimony to corroborate Gentry's, it is not reasonably probable they would not have found *independent* corroboration of Gentry's testimony and, having accepted her testimony, would accept Miller's also.

There is abundant independent evidence corroborative of the testimony of both Gentry and Miller. The evidence is of two kinds: (1) Evidence of defendant's motive: Defendant had previously served prison time for attempted rape. Lugassy charged him with raping her, and a complaint was filed against him based on her accusation. (2) Efforts by defendant to find Lugassy: She was taking nursing classes at Vista College in Berkeley, part of the Peralta Community College District. Defense witness Alan Saccheri heard Lugassy tell defendant she was a student at a junior college, and there were telephone company records of calls on October 24, 1979, from defendant to three Peralta campuses, as well as calls from him to Gentry and Miller and calls from Gentry, and from Miller, to the Peralta campuses. ■ This evidence satisfied the rule, on which the jury was correctly instructed, that accomplice testimony must be corroborated by evidence which, if believed by itself, tends to connect the defendant with the offense charged, and that such evidence need not establish every element of the

offense or corroborate all facts testified to by the accomplice. (CALJIC No. 3.12; see § 1111; *People* v. *Szeto* (1981) 29 Cal.3d 20, 26-27 [171 Cal.Rptr. 652, 623 P.2d 213] [plur. opn.], 43 [dis. opn.].)

Accordingly, even if the court had not misstated the instruction and the jury had found Miller an accomplice, so that the testimony of Gentry and Miller could not be used to corroborate each other, it is highly probable the jury would have found independent corroboration of both Gentry and Miller. Moreover, the jury could not have reasonably disbelieved Miller (insofar as she incriminated defendant) if, as the verdict implied, they believed the material, independently corroborated parts of Gentry's testimony. Therefore, no prejudice could result from any failure to apply to Miller the instructions that accomplice testimony must be viewed with distrust and must be independently corroborated to be sufficient for conviction.

### III. Failure to Instruct That Prior Inconsistent Statement may be Proof of Truth of Matter Stated

■ Defense counsel requested a special jury instruction that evidence of a prior statement of a witness inconsistent with his or her trial testimony may be considered not only to test credibility but also as proof of the statement's truth. The request was refused on the ground that CALJIC No. 2.13, which is to the same effect, would be given. In fact, no such instruction was given.

In closing argument, defense counsel stated that "I think the judge is going to" give such an instruction. He then argued that even though Miller had testified she did not come to defendant's house until 9 p.m. on November 1 (Lugassy having been killed at 8:20 p.m.), her prior inconsistent statement that she did come to his house at 8 or 8:30 p.m. that evening should be considered as establishing his alibi.

Although defendant asserts that the inconsistencies in Gentry's and Miller's testimony are "legion," the only examples given—and the only instances we have found where a prior inconsistent statement, if believed, might have helped defendant's case—are Miller's prior statements (1) that she was with defendant at his apartment at the time of the murder and (2) that Gentry, and not defendant, killed Lugassy. Those statements all came before the jury without objection, and the jury was never instructed to consider them for any limited purpose. Hence there is no basis for doubting that the jury considered them for the purpose prescribed by the omitted instruction. The omission therefore was harmless.

IV. FAILURE TO GIVE CAUTIONARY INSTRUCTIONS AS TO DEFENDANT'S ORAL ADMISSIONS

█ Defendant claims reversible error in the trial court's failure to give instructions that would have defined a defendant's admissions (CALJIC No. 2.71) and told the jury to view with caution the evidence of defendant's preoffense statements of intent, plan, or motive (CALJIC No. 2.71.7). Such instructions, when applicable, must be given sua sponte. (*People* v. *Beagle* (1972) 6 Cal.3d 441, 455 [99 Cal.Rptr. 313, 492 P.2d 1].)

The Attorney General argues that (1) the instructions were waived, and (2) their absence was not prejudicial. We need not decide the waiver question because, even if there was error, it was harmless under the *Watson* standard, *supra,* 46 Cal.2d 818, 816. (*Beagle, supra,* 6 Cal.3d at p. 455.)

The evidence to which the instructions might have applied consisted of Gentry's and Miller's testimony of defendant's expressions of intent, plan, and motive, e.g., statements of fear that Lugassy's charges would result in his returning to prison, the request to Gentry to obtain a gun, and explanations of plans to stalk and kill Lugassy. As a practical matter, the jury's belief or disbelief of the evidence of those statements was dependent on, and incidental to, their belief or disbelief of the rest of Gentry's testimony, particularly her account of the events of the evening of November 1 as to which she was the only eyewitness to defendant's presence at the murder scene. The jury was instructed to view her testimony with distrust since she was an accomplice as a matter of law.

This is not a case such as *People* v. *Ford* (1964) 60 Cal.2d 772, 799-800 [36 Cal.Rptr. 620, 388 P.2d 892], in which the culpability of the defendant's acts depended on evidence of his utterances (e.g., threats). Here, even without the preoffense statements, it was clear from the evidence of defendant's conduct, if believed, that the murder was premeditated or committed by lying in wait. His statements were additionally probative of the special circumstance, but the evidence of his contact with Lugassy, of her conduct, and of the pending proceeding against him for raping her, presented such a strong case on that issue that the lack of cautionary instruction as to his statements was unquestionably harmless.

V. FAILURE TO INSTRUCT ON SUFFICIENCY OF CIRCUMSTANTIAL EVIDENCE TO ESTABLISH GUILT (OTHER THAN GUILT OF SPECIAL CIRCUMSTANCE)

Defendant requested the giving of CALJIC No. 2.01, which says that a finding of guilt may not be based on circumstantial evidence unless the

proved circumstances are consistent with guilt and cannot be reconciled with any other rational conclusion. It also says that each fact in the chain of circumstances must be proved beyond a reasonable doubt; that a reasonable interpretation pointing to innocence must be adopted in preference to a reasonable interpretation pointing to guilt; and that any reasonable interpretation must be accepted in preference to an unreasonable interpretation.

While refusing the instruction as to issues of guilt generally, the court did give the instruction with respect to the finding of the special circumstance (i.e., that the murder was intentionally committed for the purpose of preventing the victim from testifying as witness to a crime). The trial court's decision not to give the instruction with respect to the issue of guilt was correct.

■ The instruction must be given sua sponte where the prosecution's case rests substantially on circumstantial evidence (*People* v. *Yrigoyen* (1955) 45 Cal.2d 46 [286 P.2d 1]), but it should not be given where the evidence relied on is either direct or, if circumstantial, is not equally consistent with a reasonable conclusion of innocence (*People* v. *Wiley* (1976) 18 Cal.3d 162, 174-176 [133 Cal.Rptr. 135, 554 P.2d 881]). The instruction should not be given simply because the incriminating evidence is indirect, e.g., defendant's extrajudicial admissions, but is appropriate only when "guilt must be inferred from a pattern of incriminating circumstances." (*People* v. *Gould* (1960) 54 Cal.2d 621, 629 [7 Cal.Rptr. 273, 354 P.2d 865].)

The circumstantial evidence in this case points convincingly to defendant's guilt. Under these circumstances, the failure to instruct under CALJIC No. 2.01 is not prejudicial error. (Cal. Const., art. VI, § 13.)

## VI. RECORD OF DEFENDANT'S 1975 PRISON SENTENCE FOR ATTEMPTED RAPE

Over objection, the court admitted an abstract of judgment showing that on October 24, 1975, defendant had been sentenced to prison for attempted rape. The objection was that the evidence was irrelevant and unduly prejudicial (Evid. Code, § 352). The jury was instructed that the evidence was received only "to show corroboration of the testimony of the prosecution witness, a motive for the commission of the crime charged." There was no error.

Miller had previously testified that when defendant talked about his fear of going back to prison on the Lugassy rape charge, he told her he "had been set up on a rape charge and had been in jail on a rape charge." The prosecutor offered to withdraw his proffer of the abstract of judgment if

defense counsel would stipulate that Miller was not an accomplice. Defense counsel refused to do so.

Thus, it was Miller's testimony that disclosed to the jury the nature of the charge on which defendant had been imprisoned. The abstract of judgment was offered and received only to corroborate Miller's testimony by showing defendant had in fact been "in jail on a rape charge" and, thus, to help prove defendant's motive for killing Lugassy, to keep from going back to prison.

In his opening brief, defendant conceded that evidence of his having been in prison was relevant and admissible, but contended that disclosure that he served the prison term for attempted rape was unduly prejudicial and inadmissible under Evidence Code section 352. In his supplemental briefs, however, defendant withdraws the concession that evidence of his having been in prison was relevant, and argues that it was error to admit evidence of any prior conviction.

■ He now contends evidence of the prior conviction to corroborate accomplice testimony that he had *admitted* being imprisoned on a rape charge was precluded by a general rule that other-crimes evidence cannot be used for corroboration. The cases he cites for such a rule, however, are ones in which evidence of the defendant's prior wrongful conduct was held inadmissible to corroborate a witness's testimony that the defendant engaged in similar wrongful conduct in connection with the offense charged. (*People* v. *Thomas* (1978) 20 Cal.3d 457, 468 [143 Cal.Rptr. 215, 573 P.2d 433]; *People* v. *Key* (1984) 153 Cal.App.3d 888, 894 [203 Cal.Rptr. 144]; *People* v. *Thompson* (1979) 98 Cal.App.3d 467, 472-475 [159 Cal.Rptr. 615].) Here, defendant was not charged with rape or attempted rape and the prior was not admitted for the purpose of showing defendant had a propensity to commit rape but to show his motive for committing murder —to avoid having to return to prison. This evidentiary purpose is not within the prohibition of Evidence Code section 1101, subdivision (a), under which "evidence must be excluded . . . if the inference it directly seeks to establish is solely one of *propensity* to commit crimes in general, or of a particular class" (*People* v. *Alcala* (1984) 36 Cal.3d 604, 631 [205 Cal.Rptr. 775, 685 P.2d 1126], italics added).

Cases cited by defendant rejecting prior crimes offered as evidence of motive on the theory that "if a person acts similarly in similar situations, he probably harbors the same intent in each instance" (*People* v. *Thompson* (1980) 27 Cal.3d 303, 319 [165 Cal.Rptr. 289, 611 P.2d 883]) are not relevant here. There was no attempt, for example, to introduce evidence of a prior murder, or attempted murder, for purposes of silencing a witness or

otherwise. More in point are *People* v. *Durham* (1969) 70 Cal.2d 171 [74 Cal.Rptr. 262, 449 P.2d 198] and *People* v. *Robillard* (1960) 55 Cal.2d 88, 100 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086], where the defendants were charged with killing police officers during a traffic stop and this court *allowed* evidence of outstanding offenses for which the defendants feared apprehension. As we explained in *People* v. *Alcala, supra,* 36 Cal.3d 604, 634-635, "[i]n cases like *Durham* and *Robillard,* the motive of escape is central, and it can be shown in no other way." Here, similarly, defendant's motive to kill Lugassy to prevent his being sent back to prison as a result of her testifying against him in the pending Lugassy rape charge, was central to the prosecution's case, and the evidence of defendant's extrajudicial statements of that motive made the record of the prior prison sentence significantly more probative of motive than in *Alcala.*

It is true that the hope of escaping conviction for the charged Lugassy rape could have provided a believable motive for defendant's murdering Lugassy even without the evidence defendant had previously been imprisoned on an attempted rape charge, or on any other charge. In fact, however, the prior imprisonment was integral to defendant's own statements concerning his motive as testified to by Miller; he said Lugassy had to be killed because he was not going back to jail again. On the same occasion, he said he had been in jail because he had been "set up on a rape charge."

In *People* v. *Rance* (1980) 106 Cal.App.3d 245, 251 [164 Cal.Rptr. 822], the defendant told one of the victims of his sexual assault not to scream or he would kill her; that he had just gotten out of prison; that the people who were coming to get him were responsible for sending him there; that he had dope in his car, and he was going to set them up and kill them. Similar statements were made to another such victim. The Court of Appeal held that the references to prison and dope were properly admitted because they were crucial, necessary, and inherent parts of the threats, and made the threats more intimidating and credible. So here, defendant's statement that he had previously been in prison was integral to his apparent motive in that he feared a repetition of an unpleasant experience; and the fact that the prior imprisonment was for rape could be seen as giving him first-hand experience with the crucial importance of the victim's testimony in a rape prosecution, and hence of the likelihood that elimination of the victim would stop the prosecution (as turned out to be the case when the Lugassy charge was dismissed for lack of evidence at the preliminary hearing on November 20, after her death).

Defendant separately complains of the jury instruction that evidence of his having "committed [a] crime other than that for which he is on trial" should be considered only for "determining if it tends to show corrobora-

tion of the testimony of the prosecution witness, a motive for the commission of the crime charged." But the only basis for the claimed error is the contention that the prior conviction was not admissible for the purposes stated in the instruction. Since, as explained, the conviction was admissible for those purposes, there was no such defect in the instruction.

Finally, defendant contends that the trial court did not properly perform its duty of weighing the probative value of the record of defendant's 1975 conviction for attempted rape against its prejudicial effect in response to defendant's objection under Evidence Code section 352. ■ Defendant correctly points out that when such objection is made, "the record must affirmatively show that the trial judge did in fact weigh prejudice against probative value . . . ." (*People* v. *Green* (1980) 27 Cal.3d 1, 25 [164 Cal.Rptr. 1, 609 P.2d 468]; accord, *People* v. *Leonard* (1983) 34 Cal.3d 183, 187 [193 Cal.Rptr. 171, 666 P.2d 28].)

In ruling on the motion, the trial judge observed that he had previously ruled that all prior convictions would be excluded for impeachment purposes, should defendant testify, under *People* v. *Beagle, supra,* 6 Cal.3d 441. He had then warned, however, that one or more prior convictions might be admissible under some different rule. He said he had "allowed it in through two witnesses, now" and so under that circumstance would admit the record of the conviction. It thus clearly appears from the record the court understood his duty to and did exercise his section 352 discretion.

Defendant also contends that there was nothing in Gentry's or Miller's testimony concerning defendant's statements about his prior imprisonment that would diminish the prejudicial effect of "unrefutable and actual evidence of [defendant's] conviction and incarceration." It is apparent, however, that once the jury had heard that testimony, the abstract of judgment evidencing defendant's conviction and prison sentence was far less prejudicial than it would have been had there been no other evidence of defendant's prior conviction. (*People* v. *Vidaurri* (1980) 103 Cal.App.3d 450, 461-462 [163 Cal.Rptr. 57].)

Moreover, in ruling on the admissibility of the 1975 abstract of judgment, the trial court was required to consider not only its prejudicial effect but also its probative value. It was the testimony of defendant's description of his own motive—that Lugassy had to be killed so that he would not return to prison where he had been incarcerated on a rape charge—which gave the abstract of judgment its great probative value as corroboration and as evidence of motive. (See *People* v. *Lopez* (1969) 1 Cal.App.3d 78, 85 [81 Cal.Rptr. 386].) The relation between the abstract of judgment and the prior testimony was made very clear by the prosecutor's offer to withhold

the abstract of judgment from evidence if defendant would stipulate that Miller was not an accomplice. That offer (refused by defense counsel) was made during the argument on admissibility of the abstract under Evidence Code section 352.

VII. ADMISSION OF LUGASSY'S HEARSAY STATEMENTS IDENTIFYING DEFENDANT AS HER ASSAILANT AND EXPRESSING FEAR OF DEFENDANT

Lugassy's next door neighbor, Leslie McBain, testified that on the evening of July 22, 1979, Lugassy appeared at McBain's door and said she had just been raped. Over hearsay objections, McBain testified that both then and in October, Lugassy expressed fear that her assailant would return to harm her.

Sergeant Kivett, of the Oakland police, testified that on August 9, he and a female officer interviewed Lugassy at her home. ██ Over hearsay objection, he testified that (1) Lugassy selected, from a group of photos, a photo of defendant as the person who had raped her and (2) Lugassy expressed apprehension over the fact that her assailant was out on bail and might return to harm her.

The testimony of Lugassy's fear and of her identification of defendant were admitted for the stated purpose of showing her state of mind.

Defendant concedes that Lugassy's initial statement that she had been raped was admissible under the spontaneous-declaration exception to the hearsay rule (Evid. Code, § 1240). Her photographic identification of defendant, however, was not hearsay at all since it was not "offered to prove the truth of the matter stated" (Evid. Code, § 1200, subd. (a)), that defendant had in fact raped her, but rather to show that she believed it was defendant who had raped her and intended to so testify at his trial. Her identification of defendant was relevant to the issue of motive and to the special circumstance, i.e., that he killed her to prevent her testifying against him. The facts that she had been raped and that he had been charged with that offense did not necessarily establish her belief that she could positively identify defendant as the culprit.

Defendant urges, however, that Lugassy's state of mind, i.e., her belief he was the person who raped her, was irrelevant because there was no evidence that defendant knew she had identified him. Not so. The absence of direct evidence that defendant had been informed that Lugassy had selected his photo in a photographic lineup does not establish he had not been informed of that fact. Indeed, from his statements to Gentry and Miller about the

necessity of killing Lugassy, it would not be unreasonable to infer defendant was so informed. He clearly knew Lugassy had preferred the charges against him, and would not likely believe it was necessary to kill his accuser unless he knew or believed she had identified him to the police and was prepared to identify him at trial. Thus, evidence that Lugassy had identified defendant as her assailant was relevant both to corroborate the testimony of Gentry and Miller and to help prove defendant's motive for murdering Lugassy. (Cf. *People* v. *Weidert* (1985) 39 Cal.3d 836, 853-854 [218 Cal.Rptr. 57, 705 P.2d 380].)

The evidence that Lugassy expressed fear of defendant was corroborative of Gentry's and Miller's testimony that she was constantly absent from her cottage and that Gentry's ruse—posing as a police officer making home security checks—was necessary in order to lure her outside where defendant could get at her. (See *People* v. *Armendariz* (1984) 37 Cal.3d 573, 586-587 [209 Cal.Rptr. 664, 693 P.2d 243].) The evidence presented none of the usual dangers of prejudice from a victim's hearsay statements of fear because there was no direct contact between Lugassy and defendant, so far as appears in the record, from the time of the rape, on July 22, until he killed her at 8:20 p.m. on November 1. The cases in which the victim's expressions of fear have been deemed prejudicial have been ones in which there was such direct contact giving rise to the danger that the victim's fear would be interpreted as a hearsay statement that the accused had in fact engaged in threatening conduct toward the victim. (See *People* v. *Arcega* (1982) 32 Cal.3d 504, 526-528 [186 Cal.Rptr. 94, 651 P.2d 338]. On prejudice, see *People* v. *Ireland* (1969) 70 Cal.2d 522, 532 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323].)

In his supplemental brief, defendant argues that under *People* v. *Coleman* (1985) 38 Cal.3d 69, 82-86 [211 Cal.Rptr. 102, 695 P.2d 189], the evidence of Lugassy's statements that she feared defendant would return to harm her should have been excluded. But *Coleman* found the prejudicial effect of the victim's statements (in letters) in their indications of the defendant's *conduct*. Here the only statements about defendant's conduct in the disputed utterances of Lugassy were that he had raped her and that he was out on bail. Since the facts that she had *charged* him with raping her and that he was out on bail were amply proved by other evidence, the prejudice found in *Coleman* was nonexistent here.

VIII. CROSS-EXAMINATION OF DEFENDANT'S SISTER ABOUT HER ALIBI TESTIMONY FOR DEFENDANT IN PRIOR CASE

Nancy Mosbaugh testified she was defendant's sister and lived with her parents and children in San Leandro. She testified that on November 1,

1979 (evening of the murder), defendant came to her home around 6:30 p.m. and remained 10, 15, or 30 minutes. This contradicted Gentry's testimony that on that evening she went to defendant's apartment about 6:30 p.m. and after a few minutes drove off with him to Portland Avenue (where Lugassy lived).

On cross-examination, Mosbaugh was asked whether she came into "a courtroom in this building" in April 1971 and testified to seeing her brother on November 22, 1970. Defense counsel objected that the question was beyond the scope of direct examination. The prosecution said the question went to bias, and the objection was overruled. Mosbaugh then testified that in April 1971 she testified she had been with defendant the entire evening of November 22, 1970.

Defendant claims his objection should have been sustained since the testimony tended to lead the jury to speculate that defendant had been on trial for another crime in 1971.

The relevance of the evidence to show bias was marginal. There was no attempt to show that the prior alibi testimony was false, and, as defendant's sister, Mosbaugh might be expected to know of defendant's whereabouts from time to time.

However, even if the court's ruling was erroneous, reversal would not be warranted. In the first place there was no objection on the basis now asserted. (Evid. Code, § 353.) Moreover, little prejudice to defendant resulted from Mosbaugh's answer to the question. The prejudice was slight for several reasons. It was not clear that the prior testimony was in a criminal case; the Alameda County Courthouse in Oakland houses both civil and criminal departments of the superior court. Moreover, the jury already knew defendant had been sentenced to prison in 1975 for attempted rape, so his sister's testimony was not the only means by which they learned that he had previously been involved with the law. In closing argument, the prosecutor generally attacked the sister's credibility ("She recalled what she wished to recall") but did not refer to her alibi testimony in 1971.

Accordingly, even if trial counsel had made a proper objection, the admission of the evidence would constitute harmless error under the *Watson* standard (*People* v. *Watson, supra,* 46 Cal.2d 818, 836).

IX. Failure to Give Jury Full Statutory Admonitions at Each Adjournment

Section 1122 provides that the jury must "at each adjournment of the court . . . be admonished by the court that it is their duty not to converse

among themselves or with anyone else on any subject connected with the trial, or to form or express any opinion thereon until the cause is finally submitted to them." Defendant claims error because although "at the end of each trial day, the court did admonish the jury not to converse among themselves or with anyone else on the subject of the trial and to avoid any publicity, [it] failed to include advice not to form or express any opinion on the case until the case was finally submitted."

Review of the record indicates that the court at the end of each day admonished the jurors to discuss the case with no one. That admonition clearly implies a direction not to *express* an opinion about the case. The question, then, is whether there was reversible error based on a failure to admonish the jury not to *form* an opinion on the case until it was submitted to them.

The record shows that when the jury panel was first assembled, on Wednesday, October 22, 1980, they were told to disregard any publicity about the case "because when you will be sworn on this jury, you will swear to keep an open mind with respect to this case and to decide it only upon the evidence that is introduced into this courtroom and to withhold your decision until you have heard all of the evidence in this case." This admonition to keep an open mind was equivalent to the instruction required by section 1122 not to form any opinion until submission of the case. The question is whether defendant was prejudiced by any failure to so instruct "at each adjournment of the court" (§ 1122), i.e., at each continuance of the proceedings to another court day (*People* v. *Moore* (1971) 15 Cal.App.3d 851 [93 Cal.Rptr. 447]).

After the initial admonition, there ensued five days of sequestered voir dire in which each prospective juror appeared alone to answer questions about his or her views toward the death penalty. On October 29, 1980, the panel was reassembled, and at the end of that day, they were admonished to "remember the admonitions I ha[ve] previously given you" and not to discuss the case with anyone and to disregard media publicity about the case. On October 30 and 31, the admonitions included the statement that "you are pledged to keep an open mind until the case is submitted to you for deliberation." A jury of 12 was sworn on October 31. On November 3, a second panel was assembled (to select alternates) and given admonitions that included the "open mind" language. There ensued sequestered voir dire of that panel on November 3 and 4. On November 5, the three alternates were sworn, and the entire jury given admonitions that included the "open mind" language.

Testimony began that afternoon, and there were 13 adjournments between then and the submission of the case to the jury on November 25. The

open-mind admonition was given at four of those adjournments: November 7, 10, 14, and 24. At the first of the others, November 5, the jury was told to "remember all of the admonitions I have given you." At the adjournments of November 12 and 13, which followed directly that of November 10 (at which the open-mind admonition was given), the jury was told that "I want to give you, and each time you leave the courtroom for the day, the same admonition" (Nov. 12) and to "remember the admonition I have given you" (Nov. 13). Similarly, on November 17 and 18, the adjournments next following that of November 14 (when the open-mind admonition was given), the jury was told to "remember the usual admonition (or admonitions)." At all these adjournments, the jury was expressly told to refrain from discussing the case with anyone. At only four of them (Nov. 6, 19, 20, and 21) was there neither an open-mindedness admonition nor a reference back to earlier admonitions in which the jury had been told to keep an open mind. (See *People* v. *Linden* (1959) 52 Cal.2d 1, 29 [338 P.2d 397], holding a direction to remember the previous admonition—a complete and correct one having been previously given—to be sufficient.)

██ "[E]rror in failing to give the required admonition does not require reversal unless the defendant calls the trial court's attention to the omission at the time of the adjournment, or unless the defendant on appeal affirmatively points to prejudice resulting from the omission." (*People* v. *Campbell* (1976) 63 Cal.App.3d 599, 610 [133 Cal.Rptr. 815]; see *People* v. *Fairchild* (1967) 254 Cal.App.2d 831, 839 [62 Cal.Rptr. 535].)

Prejudice is not presumed and no prejudice appears. The jury was amply warned against overt discussion of the case; the only possibility of prejudice would be from a juror's internally and subjectively making a premature judgment as to guilt. But the jury was repeatedly told to keep an open mind (even though not at the end of every session), and the general instructions to decide guilt solely on the basis of the evidence and the law stated by the court, together with the jury's deliberative process, made it improbable that any juror would think he or she had any right to adhere blindly to an opinion formed before the end of the trial.

Defendant claims ineffective assistance of counsel based on his trial attorney's failure to object to the insufficiency of the admonitions, but the absence of prejudice from the outcome precludes reversal on that ground. (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144].)

## X. APPLICABILITY OF ACCOMPLICE RULES TO SPECIAL CIRCUMSTANCE

Defendant contends that the instructions erroneously led the jury to refrain from giving him the advantage of the accomplice rules with respect

to the special circumstance. He points out that the instructions speak of *guilt* of the crime of murder, but only of the *truth* of the special circumstance. The instructions then say that the defendant cannot be "found guilty" based on the testimony of an accomplice without corroboration tending to connect the defendant with the "offense" or the "crime charged." Moreover, accomplice status is defined in terms of participation in the "crime."

Under these instructions the accomplice status of Gentry or Miller was measured by her participation in the crime of murder, regardless of the special circumstance, and corroboration could be sufficient if it simply tended to connect defendant with that crime. The instructions made clear, however, that once accomplice status was found, *all* of the accomplice's testimony should be viewed with distrust. ▉ The remaining question is whether the jury should have been instructed that the truth of the special circumstance, as distinct from guilt of the crime of murder, could not be established by the testimony of an accomplice in the absence of corroboration.

Clearly, such an instruction would not have made a difference. The first degree murder verdict establishes that the jury found defendant guilty of murder which was willful and premeditated or was committed by lying in wait. They could not have reached that verdict without believing the testimony of Nancy Gentry and finding that such testimony was corroborated. If they believed her testimony as to guilt, they must also have believed her testimony to the effect that the special circumstance was true, i.e., that defendant intentionally killed Lugassy to prevent her from testifying against him in a criminal proceeding for allegedly raping her. The special circumstance was in fact independently corroborated by evidence which also corroborated guilt, i.e., that defendant had served prison time for attempted rape, that Lugassy had charged him with raping her, and that a criminal complaint had been filed against him based on her accusation. (See *People* v. *Szeto, supra,* 29 Cal.3d 20, 26-27 [plur. opn.], 43 [dis. opn.].) Thus, if the jury had been instructed that the special circumstance could not be established by the uncorroborated testimony of an accomplice, they almost certainly would have decided that Gentry's testimony (which they believed) was corroborated. Since no prejudice could result from omission of the instruction, we need not consider whether it should have been given.

## XI. INSTRUCTION THAT JURY COULD FIND FACT BASED ON TESTIMONY OF ONE WITNESS—CONFLICT WITH ACCOMPLICE CORROBORATION REQUIREMENT?

▉ The trial court gave CALJIC No. 2.27, which allows the jury to find a fact based on the testimony of one witness. Defendant argues that this

undermined the accomplice instructions, misleading the jury into thinking they could base a finding on an accomplice's uncorroborated testimony in violation of section 1111.

A similar contention was made in *People* v. *Chavez* (1985) 39 Cal.3d 823, 829-832 [218 Cal.Rptr. 49, 705 P.2d 372]. There, we held that any such misleading effect was cured by the accomplice instructions, coupled with the fact that both counsel proceeded on the premise that corroboration of the only prosecution witness who might have been deemed an accomplice was required.

The relevant instructions given here were the same as in *Chavez,* and, as there, counsel argued on the assumption that corroboration of Gentry's testimony was required. Defendant argues that prejudice arose because the prosecutor argued that Miller was not an accomplice, and the trial judge's slip of the tongue in giving CALJIC No. 3.19 (see *ante,* p. 163) may have misled the jury into failing to make a proper finding of Miller's accomplice status. But the only claimed impropriety of CALJIC No. 2.27 was to deflect the jury from looking for *corroboration* of an accomplice-witness; it could not affect the assessment of whether a witness was or was not an accomplice. Thus, under the *Chavez* reasoning, the jury must be presumed to have applied the corroboration requirement to the testimony of Miller if, under the other instructions, they found she was an accomplice.

## XII. INSTRUCTIONS ON MOTIVE

Defendant claims that CALJIC No. 2.51, on motive, may have led the jury to disregard the instructions on the special circumstance. As to the special circumstance, the jury was instructed as follows: "If you find the defendant in this case guilty of murder of the first degree, you must then determine if the murder was committed under the following special circumstance: That Nancy Lugassy was a witness to a crime who was intentionally killed by Harvey Lee Heishman, III, to prevent her from testifying in a criminal proceeding.

"A special circumstance must be proved beyond a reasonable doubt. If you have a reasonable doubt as to whether a special circumstance is true, it is your duty to find that it is not true. In order to find the special circumstance charged in this case to be true or untrue, you must agree unanimously. You will include in your verdict on a form that will be supplied whether the special circumstance is or is not true.

"To find that the special circumstance, referred to in these instructions as murder of a witness to a crime, is true, each of the following facts must be proved:

"Number one, that the person killed was a witness to a crime; and number two, that the witness was intentionally killed for the purpose of preventing the witness' testimony in a criminal proceeding; and number three, that the killing was not committed during the commission or attempted commission of the crime to which the person killed was a witness."

At a much later point in the instructions, the jury was given a modified form of CALJIC No. 2.51, as follows: "Motive is not an element of the crime charged and need not be shown. However, you may consider motive or the lack of motive as a circumstance in this case. Presence of motive may tend to establish guilt; absence of motive may tend to establish innocence. You may, therefore, give its presence or absence, as the case may be, the weight to which you find it to be entitled." (In CALJIC No. 2.51, the last sentence begins, "You will therefore give . . . .")

■■■ Defendant contends that since a motive (preventing the victim from testifying) was at the very core of the special circumstance, it was prejudicial error to instruct that motive "is not an element of the crime charged and need not be shown."

The instructions, however, made a clear distinction between the crime of murder, of which the jury was directed to find defendant guilty or not guilty, and the special circumstance, which the jury was directed to find true or not true. The motive instruction, CALJIC No. 2.51, focused on guilt. The special circumstance instruction told the jury that *if* they found defendant guilty of murder, *then* they should decide whether the special circumstance was true or not true in accordance with criteria dealing with the purpose of the killing. There was no reasonable basis for the jury to think that CALJIC No. 2.51 modified the special circumstance instruction.

PENALTY PHASE EVIDENCE

At the penalty phase, the prosecution called as witnesses five women who testified to having been sexually assaulted by defendant. Patrice S. testified that in July 1968, when she was 15, she was raped by defendant when he came to her home as a guest of her brother. Melody C. testified that at age 16, in June 1968, she was raped by defendant at his parents' home, where he had taken her after they had been out on a date. Maria M. testified that in July 1969, after she had accepted defendant's invitation to go out for a cup of coffee, he drove her to a secluded spot, parked, and attempted to rape her, but she escaped, leaving her purse behind. Lori H. testified that in July 1975, while she was out on a date with defendant, he parked on a secluded road and raped her. Tammy Q. testified that in April 1979, when she was 19 and living in Nevada, she met defendant and went to his apartment, where

they smoked marijuana and he then raped her. She reported the incident to the police and was subpenaed to testify, but she failed to appear because she was afraid of defendant.

The remaining prosecution evidence consisted of copies of records of criminal proceedings against defendant. An information charged him with the rapes of Patrice S. and Melody C.; he pleaded guilty to the first charge and in December 1969 was given a suspended sentence conditioned on spending one year in the county jail. A criminal complaint, issued in Nevada, charged defendant with sexual assault against Tammy Q., and a subpena was issued ordering her to appear at a preliminary hearing. Further records indicated that defendant had been convicted of similar crimes against three additional victims (who did not testify): a forcible rape in October 1970, a burglary and rape in November 1970, and an assault with intent to commit rape, also in November 1970.

Finally, the Attorney General points to the abstract of judgment, introduced at the guilt phase, showing that on October 24, 1975, defendant was sentenced to prison for attempted rape, and asserts that that sentence was based on the incident testified to by Lori H. Defendant replies that the abstract does not identify the victim and, further, that it was introduced at the guilt phase for the limited purpose of proving intent and corroborating accomplice testimony and therefore was not proof of a crime against Lori H.

Defendant's penalty phase evidence pertained to his general character and background. Glen Morrison, a chaplain, testified he had visited defendant in jail about every three weeks beginning in March 1980 and concluded that defendant had really become a Christian as opposed to a jailhouse convert. Though not aware of the extent of defendant's criminal record, Morrison said that defendant had expressed "great remorse over his past."

Marilyn N. testified that she met defendant in May 1978 and dated him weekly until April 1979, when he moved to Tahoe. They had sexual relations, but on the occasions she refused him, he did not force her. When he returned from Tahoe in July 1979, they resumed dating until the end of the summer. He did not tell her he was then seeing other women. She next visited him in jail in February 1980, after his arrest for the Lugassy murder. She said they had a good relationship and that he does not deserve the death penalty because "the Lord has got a plan for him."

Donna W. testified she met defendant after Thanksgiving of 1979 and dated him regularly until his arrest in February. He treated her well, and

they talked of marriage. He never forced her to do anything, but she never refused him sexual relations.

Robert Scott, employed by the Department of Corrections, testified from records (in evidence) that defendant had been a state prison inmate from 1971 to December 1974, when he was released on parole, and again from October 1975 until he was paroled in November 1977. Scott knew defendant as an inmate at Deuel Vocational Institution (DVI) in 1976 and 1977. He said defendant was a model inmate and worked as a meat cutter in the culinary section. He also said that defendant was "manipulative," always insisted he had been framed, and exhibited no remorse for any prior conduct. William Dorrity, a correctional counselor who had also known defendant at DVI during that period, gave similar testimony.

Sybil D. met defendant in August 1970 while working at the Alameda County jail at Santa Rita, where defendant was incarcerated. After his release that month, they dated until his reincarceration in January 1971. She continued to visit him, and they were married in July 1972, while defendant was an inmate at Vacaville. In June 1973, their daughter was born, and six months later she filed for divorce. She has refused to let defendant visit the daughter or contribute to the child's support because defendant had many problems to work out and she wanted to minimize "confusion" for the child. Though at first he refused to accept responsibility for the three sexual assaults for which he was sent to prison in January 1971, he admitted them to her a year later.

A butcher testified he had employed defendant to do "boning" for several months up to September 1979, and a construction superintendent testified that defendant had worked under him as a laborer for three or four months beginning in October 1979. Both said that defendant was a satisfactory worker and that their only problem with him was his tardiness and absences, but in neither case was that the reason for his being laid off.

Defendant's mother, Helen Heishman, testified defendant was born June 14, 1948, and was an Rh-factor baby, requiring blood transfusions. In 1965 her recently widowed mother-in-law came to live with the family, was given a room next to defendant's, and committed suicide. Defendant discovered the suicide, then became withdrawn and would not discuss the matter. Defendant attempted to get into military service but was rejected as asthmatic.

Defendant's great-aunt, Ida Wood, testified that she came to stay with defendant and his sister for a week while defendant's parents went to Missouri to bury the grandmother who had committed suicide. At that time

defendant was very quiet. During prior visits, defendant had been likable, affectionate, and well mannered.

Defendant's sister, Nancy Mosbaugh, testified that their grandmother had committed suicide by hanging herself in a closet. She said that after discovering the suicide, defendant became very withdrawn. Mosbaugh also testified that while defendant was imprisoned at Vacaville, she participated in group therapy sessions with him, along with Sibyl D. and others, for about a year. He eventually talked about his prior cases, became upset, started crying, and expressed remorse for his prior acts.

### XIII. FAILURE TO INSTRUCT SUA SPONTE THAT OTHER CRIMINAL ACTIVITY COULD NOT BE CONSIDERED IN AGGRAVATION UNLESS PROVED BEYOND A REASONABLE DOUBT

In light of the prosecution's reliance on other criminal activity, involving violence, as aggravating factors to be weighed in favor of imposing the death penalty, defendant was entitled to an instruction that evidence of other crimes could be considered only if the commission of such crimes was proved beyond a reasonable doubt. (*People* v. *Davenport* (1985) 41 Cal.3d 247, 280 [221 Cal.Rptr. 794, 710 P.2d 861]; *People* v. *Phillips* (1985) 41 Cal.3d 29, 65 [222 Cal.Rptr. 127, 711 P.2d 423]; *People* v. *Robertson* (1982) 33 Cal.3d 21, 53-54 [188 Cal.Rptr. 77, 655 P.2d 279].) The Attorney General concedes that omission of the instruction was error but contends the error was not prejudicial.

Generally, the potential for prejudice from failure to give this instruction is serious because "other crimes" evidence may have a particularly damaging impact on the jury's determination whether to impose the death penalty. (*People* v. *Davenport, supra,* 41 Cal.3d at pp. 280-281; *People* v. *Robertson, supra,* 33 Cal.3d at p. 54.) Here, the accounts by five witnesses of being the victims of rape or attempted rape by defendant must, insofar as believed by the jury, have played a major part in their death penalty verdict. On the other hand, defense counsel presented no evidence to contradict this testimony and, though he cross-examined each witness as to details, did not succeed in exposing any significant inconsistencies or obtaining any retractions. Even in oral argument, counsel did not question the truth of any of the testimony of other crimes. Instead, he argued that "imposing the death penalty on [defendant] will not undo the attacks that he perpetrated on the women who testified in court," and that defendant already "has been punished for those acts." The major thrust of his argument was a plea for mercy based on the evidence of defendant's character and background, and a philosophical argument against the death penalty in general.

Moreover, the jury had before it evidence that defendant had been *convicted* of raping or attempting to rape three victims in addition to those who had testified and, further, of raping one (Patrice S.) who did testify. Moreover, defendant had formally admitted these convictions in pleading to the information, and those admissions were conclusive for all subsequent proceedings in the case. (§ 1025.) No instruction that these convictions must be proved beyond a reasonable doubt would have been appropriate.

■ Since all the crimes advanced as an aggravating factor were proved by direct, uncontradicted testimony that defense counsel found no basis for attacking at final argument, and since the jury had properly before it evidence of defendant's prior convictions of several similar crimes, the court's error in failing to instruct that defendant's other violent criminal activity must be proved beyond a reasonable doubt could not have affected the penalty verdict and was thus harmless under any standard of prejudice.

We also observe that defendant's requested instruction would have told the jury each prior crime not only must be proved beyond a reasonable doubt in the mind of an individual juror before the juror can consider it as an aggravating factor, but also that the jury must *unanimously* find the prior crime's existence. No such unanimity is required. (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113].)

XIV. ABSENCE AT PENALTY PHASE OF JURY INSTRUCTION ON GENERAL LEGAL PRINCIPLES APPLICABLE

■ At the penalty phase, the court simply instructed on the statutory aggravating and mitigating factors and how they should be considered in fixing the penalty (CALJIC Nos. 8.84, 8.84.1, 8.84.2). Defendant contends it was error for the court not to give, sua sponte, the numerous instructions given at the guilt phase on the respective duties of judge and jury, how to consider evidence, the law of accomplices, and other subjects, as well as other instructions that defendant claims were erroneously omitted at the guilt phase. But he gives few instances of how any of those instructions were necessary or even appropriate for the penalty phase. He argues that without CALJIC Nos. 2.60 and 2.61, given at the guilt phase, the jury was free to take into account defendant's failure to testify. But such instructions were not requested at the penalty phase and should not have been given sua sponte since defense counsel might have concluded it would be to defendant's disadvantage to draw attention to his failure to testify. (See *People* v. *Gardner* (1969) 71 Cal.2d 843, 852-854 [79 Cal.Rptr. 743, 457 P.2d 575].)

Defendant further argues that without the accomplice instructions, the jury could consider Gentry's and Miller's testimony without applying ac-

complice rules. But neither Gentry nor Miller testified at the penalty phase, and, in light of the guilt phase verdict, there is no basis for conjecturing that there were any significant parts of their testimony, rejected at the guilt phase, which the jury might have accepted on reconsideration at the penalty phase.

Defendant contends that without more guidance as to the applicability of the guilt phase instructions at the penalty phase, the jury may have improperly applied at the penalty phase the guilt phase instructions to disregard pity and sympathy. But the instructions told the jury to disregard pity and sympathy only in determining guilt, not in fixing the penalty. They stated: "[T]he function of a jury is to determine the issues of fact that are presented by the allegations in the information and the defendant's plea of *not guilty* thereto. This duty you should perform uninfluenced by pity for the defendant or by passion or prejudice against him. . . . [I]n determining the *guilt or innocence* of the defendant, you are to be governed solely by the evidence presented upon the trial and the law as stated by the court. *For such purpose* the law forbids you to be governed by sentiment, conjecture, sympathy, passion, prejudice, or public opinion or public feeling." (Italics added.)

Moreover, as in *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 784-786, any theoretical possibility that the jury would apply to penalty phase deliberations any guilt phase instructions to disregard sympathy was virtually eliminated by the prosecutor's closing argument to the jury at the penalty phase. In that argument, he invited the jury to look for mitigating factors in any of the evidence they had heard and said, "Maybe you can find some place in your heart to feel sorry for [defendant]. I certainly can't."

XV. ABSENCE OF SUA SPONTE INSTRUCTION ON ELEMENTS OF CRIMES PROVEN IN AGGRAVATION

Defendant contends that the trial court erred by failing to give, on its own motion, a jury instruction stating the elements of the crimes pointed to by the prosecution as aggravating factors. There is no sua sponte duty to give such instructions since a defendant, for tactical reasons, may not want them. Consequently, a defendant's failure to request such instructions will preclude him from raising the issue on appeal, even though the instructions may be appropriate when requested by either party or when the court determines they are vital to a proper consideration of the evidence. (*People* v. *Davenport, supra,* 41 Cal.3d 247, 281-282; *People* v. *Phillips, supra,* 41 Cal.3d 29, 72-73, fn. 25.)

The possible existence of tactical reasons for not requesting the instructions in question precludes, as a basis for reversal on appeal, defend-

ant's contention that his attorney's failure to request the instructions constituted ineffective representation by counsel. (*People* v. *Fosselman, supra,* 33 Cal.3d 572, 581-582; *People* v. *Pope* (1979) 23 Cal.3d 412, 425-426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

### XVI. INSTRUCTION THAT IF MITIGATING OUTWEIGHED AGGRAVATING CIRCUMSTANCES, JURY "SHOULD" IMPOSE LIFE WITHOUT POSSIBILITY OF PAROLE

Section 190.3 provides that if the trier of fact "concludes that the aggravating circumstances outweigh the mitigating circumstances," it "shall impose a sentence of death," whereas if it "determines that the mitigating circumstances outweigh the aggravating circumstances, [it] shall impose a sentence of . . . life without the possibility of parole." Here, however, the court instructed as follows: "If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you *shall* impose a sentence of death *or life without possibility of parole,* taking into consideration all of the circumstances. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you *should* impose a sentence of confinement in the State Prison for life without the possibility of parole." (Italics added.)

The first of these two sentences was more favorable to defendant than the wording of the statute, since it expressly permitted the jury to refrain from imposing the death sentence even though they concluded that the aggravating circumstances outweighed the mitigating circumstances. ▉ Defendant's complaint is with the second sentence, which told the jury that if they determined that the mitigating circumstances outweighed the aggravating circumstances, they "should" impose a sentence of life without possibility of parole. Defendant contends that the use of "should," in contrast to "shall," implied that a life sentence was not mandatory and that therefore the jury may have imposed the death sentence even though they decided that the mitigating outweighed the aggravating circumstances.

The word "shall" is used to express command or exhortation, or, in law, to state what is mandatory (Webster's New Internat. Dict. (3d ed. 1961) p. 2085), whereas "should" is used to express "duty, obligation, necessity, propriety, or expediency" (*id.* at p. 2104). Thus, for a juror to vote for the death penalty even after concluding that the mitigating outweighed the aggravating circumstances would amount to defiance of the court's instruction that the jury had a duty or obligation to impose only a life sentence under those conditions. The jury's conscientious concern to apply the statutory aggravating and mitigating factors was manifested by their request that those factors be reread to them in the middle of their penalty deliberations.

There is no realistic possibility that the court's use of "should" instead of "shall" in the instruction affected the verdict.

## XVII. CONSTITUTIONALITY OF DEATH PENALTY STATUTE

Defendant contends that the present death penalty law (§ 190 et seq.) is unconstitutional in that it lacks six procedural safeguards that are claimed to be constitutionally required, and thus fails to meet federal standards for assuring a rational and consistent application of the death penalty. The contention has been rejected by this court. (*People* v. *Rodriguez, supra,* 42 Cal.3d 730, 777-779.)

## XVIII. INSTRUCTION ON AGGRAVATING AND MITIGATING FACTORS THAT WERE NOT SUPPORTED BY EVIDENCE

■ Defendant contends that the trial court prejudicially erred by instructing the jury to consider all the aggravating and mitigating factors listed in section 190.3 even though some of those factors were clearly irrelevant, e.g. factor (e) (whether or not the victim participated in or consented to the crime) and factor (f) (whether or not the offense was committed under circumstances which defendant reasonably believed to be a moral justification or extenuation for his conduct).

The Attorney General argues that the entire list of factors is appropriate to inform the jury what categories of factors society deems relevant to the sentencing determination, and that it is appropriate to consider what factors are absent as well as what are present. Defendant argues that since some of the statutory mitigating factors, such as those specified in factors (e) and (f), are usually not present, permitting consideration of the absence of these factors as aggravating circumstances makes these aggravating circumstances automatically applicable to most murders and constitutes serious error. (*People* v. *Davenport, supra,* 41 Cal.3d 247, 289 [plur. opn.].) We agree with defendant that the jury should not construe the absence of a mitigating factor as an aggravating factor, but that is not what happened here.

There is no realistic possibility that any juror would do that unless so instructed or, possibly, urged by argument of counsel. Here, the instruction, pursuant to section 190.3 ("the trier of fact shall take into account any of the following factors if relevant"), told the jury to "consider, take into account, and be guided by the following factors, *if applicable*" (CALJIC No. 8.84.1, italics added). Thus, the instruction was to disregard, rather than to give weight to the absence of, an inapplicable factor. (*People* v. *Ghent* (1987) 43 Cal.3d 739, 776-777 [239 Cal.Rptr. 82, 739 P.2d 1250].)

Nor did the prosecutor argue aggravation based on the absence of any statutory mitigating factor. He recited the first three factors—(a) circumstances of the crime and existence of any special circumstance, (b) criminal activity involving violence or the threat of violence, and (c) prior felony convictions—and declared that they were "the three critical factors." He then listed the others which, he said, "the court will tell you that you can take into account, if they apply, if you could find any evidence to support them." Next, he argued "that the only evidence you've heard pertains to the first three factors in aggravation, and let's weigh those." He accordingly proceeded with a forceful argument based on those three factors. After that, he discussed the evidence introduced by defendant at the penalty phase, arguing that that evidence was outweighed by the evidence supporting the first three aggravating factors. There was no further reference in the argument to the remaining eight statutory factors, let alone any contention that aggravation should be inferred from the absence of any of them.

Hence, the jury was not misled into treating the mere absence of any mitigating factor as an aggravating factor.

### XIX. FAILURE TO INSTRUCT THAT CRIMINAL ACTIVITY INVOLVING VIOLENCE (§ 190.3, FACTOR (b)) DOES NOT INCLUDE THE CIRCUMSTANCES OF THE PRESENT CRIME (§ 190.3, FACTOR (a))

The jury was instructed, in the language of CALJIC No. 8.84.1, that in determining the penalty, they should "consider, take into account and be guided by the following factors, if applicable." There followed a statement of the factors listed in section 190.3, factors (a) through (k), beginning with those in (a) and (b) as follows: "Number one [factor (a)], the circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance found to be true. Number two [factor (b)], the presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the expressed or implied threat to use force or violence."

■ The criminal activity to be considered under factor (b) does not include the circumstances of the crime for which the defendant is being prosecuted in the current proceeding (factor (a)). (*People* v. *Miranda* (1987) 44 Cal.3d 57, 105-106 [241 Cal.Rptr. 594, 744 P.2d 1127].)

Defendant contends it was error not to modify the instruction so as to exclude those circumstances from factor (b). We disagree since there is no indication from the record that the instruction would lead a reasonable jury to "double count" under factors (a) and (b). Factor (b) was supported by ample evidence of violent criminal activity wholly apart from the circum-

stances of the present crime cognizable under factor (a). Moreover, the prosecutor did not attempt to identify any of the circumstances of the present crime as criminal activity under factor (b). Instead, he explained factors (a) and (b), together with factor (c) (prior felony convictions), and undertook to demonstrate that the evidence supported all three factors combined, without attempting to identify the particular factor to which each evidentiary item pertained. Thus, the prosecutor's argument focused on the evidentiary facts themselves and thereby allayed the danger that any particular fact would be counted in support of more than one factor. Accordingly, there was no error. (*People* v. *Kimble* (1988) 44 Cal.3d 480, 505 [244 Cal.Rptr. 148, 749 P.2d 803].)

XX. Failure to Instruct That Jury Could Consider any Aspect of Defendant's Character or Record Offered as Mitigating

 Defendant claims prejudice from the trial court's failure to instruct the jury to consider evidence, offered in mitigation, pertaining to defendant's character and background.

In *People* v. *Easley* (1983) 34 Cal.3d 858, 878 [196 Cal.Rptr. 309, 671 P.2d 813], we pointed out that factor (k), which directs the jury to consider, in determining the penalty, "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime" (§ 190.3, factor (k)), is potentially confusing in that it may mislead the jury into not realizing that it may consider other aspects of the defendant's character or background not necessarily connected with the crime itself. We concluded that in the future, juries being instructed under section 190.3, factor (k), should be told, in language taken from *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 989-900, 98 S.Ct. 2954], to consider as a mitigating factor any other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death. (34 Cal.3d at p. 878, fn. 10.)

At the penalty phase of the trial in *People* v. *Davenport, supra,* 41 Cal.3d 247, held in 1981, prior to our *Easley* decision, *supra,* 34 Cal.3d 858, the defense introduced, as evidence of mitigation, testimony of the defendant's stepfather and three social workers dealing with his character and background. The prosecutor urged the jury to discount that evidence as a mere appeal to sympathy, arguing that evidence of the defendant's background could be considered a mitigating circumstance only if it was related to the crime of which he was convicted. (41 Cal.3d at pp. 276-277.) The ensuing jury instructions told the jury to consider the statutory factors, including factor (k)("[a]ny other circumstance which extenuates the gravity of the

crime"), without informing them they could consider other aspects of the defendant's character or record offered in mitigation. In light of the prosecutor's argument, this omission from the instructions, together with two other instructional errors, was held ground for reversal of the judgment as to penalty. (*Id*. at pp. 282-284.)

Here, as in *Davenport, supra,* 41 Cal.3d 247, the trial preceded *Easley, supra,* 34 Cal.3d 858, and the trial court instructed on the statutory factors without informing the jury they could consider evidence of character and background offered in mitigation. But the prosecutor's argument did invite the jury to consider—and then reject as insufficient—that evidence. He explained at the outset of the argument: "The judge will instruct you that your role now is to weigh the aggravating circumstances that you've heard against the mitigating circumstances, if you find any, from the evidence. Now, if you can find in that balance from the evidence that you've heard in this courtroom any mitigating factors or mitigating evidence that outweighs the factors you've heard in aggravation, if you can find that from this evidence, then you should give defendant the lesser penalty of life without the possibility of parole; but, on the other hand, if you find that the aggravating circumstances that you've heard outweigh and far outweigh any mitigating factors, then you should impose the proper and appropriate punishment of death." He then argued the aggravating aspects of the evidence of the circumstances of the murder, the prior criminal activity, and the prior felony convictions.

Next he asked, "What has the defendant presented? What has he brought to the courtroom to put on the scales, to put in the balance against all those factors in aggravation?" He reviewed the testimony of each of the penalty phase defense witnesses, attempting to minimize or belittle any parts of their testimony that might be thought mitigating. He summarized that testimony as follows: "Why was that evidence brought in? Well, that is simply an attempt to generate some kind of sympathy on your part for Lee Heishman. Maybe you can find some place in your heart to feel sorry for him. I certainly can't. What was really striking is that that was the best they could do. That was the best that the defense had. From 32 years of life, that was the very best that they could present that anybody could say about Lee Heishman's life. I frankly can't find one single factor from any of that testimony that weighs in mitigation. All of the evidence I heard goes into the balance against him."

This argument by the prosecutor made clear that the jury should look for mitigation in any of the evidence they had heard. He even suggested they were free to base the penalty verdict on sympathy ("Maybe you can find some place in your heart to feel sorry for him"). The prosecutorial argu-

ment thus eliminated any realistic possibility the jury would be misled by the instructions into thinking they could not consider, in mitigation, all of the testimony offered by defendant concerning his character and background. (See *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 786-787.)

### XXI. FAILURE TO INSTRUCT JURY THAT BEFORE IMPOSING DEATH PENALTY THEY MUST BE CONVINCED BEYOND A REASONABLE DOUBT THAT DEATH IS THE APPROPRIATE SENTENCE

Defendant contends he was constitutionally entitled to have the jury instructed that they should not impose the death penalty unless they were convinced beyond a reasonable doubt (1) that the aggravating factors outweigh the mitigating factors and (2) that death is the appropriate penalty. These constitutional contentions were recently rejected by this court in *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 777-779.

### XXII. PROSECUTORIAL EVIDENCE UNRELATED TO STATUTORY AGGRAVATING FACTORS

Defendant contends that prejudicial error occurred at the penalty phase when the prosecution introduced evidence not related to any of the statutory aggravating factors. In *People* v. *Boyd* (1985) 38 Cal.3d 762, 772-776 [215 Cal.Rptr. 1, 700 P.2d 782], we held that the prosecution may not, as part of its penalty phase case-in-chief, introduce evidence that is not relevant to one of the factors, other than factor (k), which section 190.3 directs the trier of fact to consider in determining the penalty. "Once the defense has presented evidence of circumstances admissible under factor (k), however, prosecution rebuttal evidence would be admissible as evidence tending to 'disprove any disputed fact that is of consequence to the determination of the action.' (Evid. Code, § 210.)" (*Id.* at p. 776.) The *Boyd* opinion did not address the possible effect of this holding on the permissible scope of the prosecutor's cross-examination of witnesses testifying for the defense in mitigation.

██ Defendant contends that under these principles it was reversible error for the prosecution to introduce evidence that he had failed to express remorse for his criminal conduct. Although a defendant's lack of remorse could be considered by a jury in deciding whether to impose the death penalty under former section 190.1 in effect prior to 1972 (*People* v. *Coleman* (1969) 71 Cal.2d 1159, 1168 [80 Cal.Rptr. 920, 459 P.2d 248]), and arguably could be proved under the 1977 death penalty statute (*People* v. *Boyd, supra,* 38 Cal.3d 762, 772; *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 773 [175 Cal.Rptr. 738, 631 P.2d 446]), it does not pertain to an aggravating factor listed in section 190.3 and therefore cannot be proved by the prosecu-

tion as part of its case-in-chief at the penalty phase (*Boyd, supra,* 38 Cal.3d at pp. 775-776).

The question of defendant's lack of remorse came before the jury in the following manner: Defendant's first witness at the penalty phase, Chaplain Morrison, testified he had repeatedly visited defendant in jail after the latter's arrest on the present murder charge and concluded that defendant had become a Christian "in the real sense of the word" and not merely a "jailhouse convert." On cross-examination, Morrison was asked whether "someone sincerely interested in making positive changes in their life . . . would have to have some remorse for their past conduct." He answered in the affirmative and testified that defendant "has shown great remorse over his past." Robert Scott and William Dorrity, who were on the staff at DVI while defendant was imprisoned there in 1976 and 1977, testified that defendant was a model prisoner. Both testified on cross-examination that defendant had shown no remorse for his past conduct. Finally, defendant's sister, Nancy Mosbaugh, testified on direct examination that when she attended group therapy sessions at Vacaville, where defendant was imprisoned, he expressed remorse for his prior acts. When asked on cross-examination whether the remorse was that he was sorry about being in prison, she testified that "he felt sorry for the girls and what he had done to them."

Thus, the only testimony that defendant lacked remorse was elicited through the prosecutor's cross-examination of Scott and Dorrity. But the prior testimony of another defense witness, Chaplain Morrison, that defendant had undergone a genuine change in his life which included showing remorse for his past conduct, had opened the door, under *Boyd, supra,* 38 Cal.3d at page 776, for the prosecution to show lack of remorse on rebuttal. In light of *Boyd,* there appears no sound reason to bar a prosecutor from disputing defense mitigation testimony through cross-examination of the defense witnesses. Hence, Scott's and Dorrity's testimony on cross-examination that defendant lacked remorse was admissible.

Defendant complains of other questions put to his witnesses on cross-examination. The questions as to whether defendant was manipulative or devious were proper to probe the truth of the witnesses' direct testimony. They were put to Chaplain Morrison, who had testified that defendant had become a real Christian rather than a "jailhouse convert," to Scott and Dorrity, who as prison correctional counselors testified that defendant had been a model inmate, and to Nancy Mosbaugh, defendant's sister, who on direct examination had described defendant's reaction to prison group therapy. A question to Mosbaugh whether she had told a woman (who did not testify) not to try to get child support from defendant because he had other children he never supported, allowed over an objection it was outside the

scope of direct examination, should have been excluded but created no substantial prejudice since Mosbaugh answered in the negative and Sybil D. had testified she had not accepted child support from defendant for his and her child.

Donna W., who testified to having a satisfactory romantic relationship with defendant beginning in late November 1979, testified on cross-examination that he had told her he was a ski instructor and had been in prison on a false rape charge. She was asked whether she had found out that he was not a ski instructor, to which she replied in the negative. The question was proper in light of guilt phase testimony that shortly after defendant's initial encounters with Lugassy, Gentry, and Miller, he told each of them that he was a ski instructor, and that this was a false "line" that he used.

Donna W. was also asked whether she was aware of defendant's arrest in December 1979 on a drug charge, to which she replied that he told her he had been arrested for some marijuana that was not his. Though relevant to defendant's candor in his relationship with Donna W., the question also brought out unproved charges of additional criminal activity. But the question was not objected to, and in any event the reply was harmless in light of Tammy Q.'s testimony of defendant's smoking marijuana and the evidence of far more serious violent offenses committed by defendant.

## XXIII. Admissibility of Unadjudicated Crimes as Aggravating Factor

Five women testified they had been the victims of sexual assaults by defendant. The evidence clearly established convictions of defendant for only one of those crimes, the rape of Patrice S. Defendant contends, on various grounds, that it was reversible error to admit evidence of the other four. We do not agree.

Section 190.3 authorizes consideration by the trier of fact, at the penalty stage, of criminal activity by the defendant which involved the use or attempted use of, or threat to use, force or violence, other than activity pertaining to an offense for which the defendant was prosecuted and acquitted. Moreover, the section specifies that for its purposes, "criminal activity does not require a conviction." In *People* v. *Balderas* (1985) 41 Cal.3d 144, 204-206 [222 Cal.Rptr. 184, 711 P.2d 480], we upheld the use as an aggravating factor, under section 190.3, of violent crimes with which the defendant has been neither charged nor convicted. Similarly, the mere fact that the defendant has been charged with a violent crime does not bar such use. Neither a lack of evidence of the disposition of the charge nor a showing that the charge was dismissed at a preliminary hearing bars use of

the offense as one "for which the defendant was prosecuted and acquitted" (§ 190.3).

Defendant complains of the overruling of his hearsay objection to the Nevada court records of the charge against him as to Tammy Q. But the records were introduced to show the fact of the charge against him, not its truth, and were probative of Tammy's state of mind, as to which she could be cross-examined.

■■■ Defendant contends that the testimony of Melody C. and Maria M. concerning crimes committed against them in 1969 should have been excluded on the ground that at the time of the penalty trial, prosecution for those crimes was barred by the three-year statute of limitations provided by former section 800. He argues that the purpose of statutes of limitations is to "[specify] a limit beyond which there is an irrebuttable presumption that a defendant's right to a fair trial would be prejudiced" (*United States* v. *Marion* (1971) 404 U.S. 307, 322 [30 L.Ed.2d 468, 479-480, 92 S.Ct. 455]). But there is and was no statute of limitations applicable to the crime for which defendant was on trial here, i.e., murder. (Former § 799.) In *People* v. *Balderas, supra,* 41 Cal.3d 144, we observed that section 190.3, factor (b), "imposes *no* time limitation on the introduction of 'violent' crimes; the jury presumably may consider criminal violence which has occurred at any time in the defendant's life." (*Id.* at p. 202.) "Subdivision (b) allows in *all* evidence of *violent* criminality to show defendant's propensity for violence." (*Ibid.*) Moreover, in *People* v. *Terry* (1969) 70 Cal.2d 410, 422 [77 Cal.Rptr. 460, 454 P.2d 36], we held that the fact that prosecution of prior criminal acts would be barred by the statute of limitations did not prevent their introduction at a penalty hearing under the pre-1972 death penalty statute as evidence "of the circumstances surrounding the crime, of the defendant's background and history, and of any facts in aggravation or mitigation of the penalty" (former § 190.1). Accordingly, evidence of a defendant's criminal acts that is otherwise eligible for introduction and consideration under section 190.3, factor (b), is not subject to exclusion on the ground that prosecution for those acts would be barred by a statute of limitations.

■■■ Defendant contends that the evidence of his raping Melody C. should have been excluded because the charge of that crime was dismissed as the result of a plea bargain after he pleaded guilty to the rape of Patrice S. In *People* v. *Harvey* (1979) 25 Cal.3d 754 [159 Cal.Rptr. 696, 602 P.2d 396], there was a plea bargain under which the defendant pleaded guilty to two counts of robbery, and a third count, charging an unrelated robbery, was dismissed. We held that it was error for the trial judge to consider facts underlying the dismissed robbery charge in fixing the upper prison term for the first count (see § 1170, subd. (b); Cal. Rules of Court, rule 421(b)(1)),

reasoning that "[i]mplicit in [the] plea bargain . . . is the understanding (in the absence of any contrary agreement) that defendant will suffer no adverse sentencing consequences by reason of the facts underlying, and solely pertaining to, the dismissed count." (*People* v. *Harvey, supra,* 25 Cal.3d at p. 758.) That constraint against reliance on facts underlying the dismissed count to fix the sentence in the very case for which the plea bargain was executed does not preclude the use of such facts in the penalty phase of a later, separate trial for murder with special circumstances, in order to show criminal activity involving violence as an aggravating factor. (*People* v. *Melton* (1988) 44 Cal.3d 713, 755-756 [244 Cal.Rptr. 867, 750 P.2d 741].)

Defendant further argues that a dismissal is the equivalent of an acquittal, and that, therefore, because of the express exclusion of evidence of prior criminal activity pertaining to an offense for which the defendant has been "prosecuted and acquitted" (§ 190.3), the dismissal, proved at the guilt phase, of the charge against defendant of raping Lugassy required the court to instruct the jury not to consider the facts of that rape as violent criminal activity under section 190.3, factor (b). We reject this contention because a dismissal not based on any judicial determination with respect to the truth or falsity of the charge is not an acquittal under section 190.3. (*People* v. *Ghent, supra,* 43 Cal.3d 739, 774.)

## XXIV. Exclusion of Mitigating Evidence

 Defendant contends that the trial court prejudicially erred by sustaining prosecution objections in violation of the federal constitutional rule that a sentencing jury may not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record that the defendant offers as a basis for a sentence less than death. (See *Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 110 [71 L.Ed.2d 1, 8, 102 S.Ct. 869]; *Lockett* v. *Ohio, supra,* 438 U.S. 586, 604 [57 L.Ed.2d 973, 990]; *People* v. *Easley, supra,* 34 Cal.3d 858, 877-878.) Although it is true that some of defense counsel's questions to which objections were sustained should have been allowed under that rule, any consequent adverse effects upon defendant were too slight to give rise to any possibility that absence of the errors would have affected the verdict.

Defendant's sister, Nancy Mosbaugh, was asked what defendant's reaction was to discovering that his grandmother had hung herself in a closet, and an objection—that the question called for speculation because the witness "wasn't there"—was properly sustained. Immediately thereafter, Mosbaugh was allowed to testify that after the grandmother's death, defendant "became very withdrawn." Similarly, the court ruled properly that defendant's mother could not testify to his reaction to discovering the suicide

"unless she was there with him," but was allowed to testify that "he screamed all that night" and then became withdrawn and would not discuss the matter. There was no error in these rulings.

Ida Wood, defendant's great-aunt, was asked whether there were difficulties with defendant around the time of his birth. An objection, that the question was irrelevant and called for a medical opinion, was incorrectly sustained. However, later defendant's mother was allowed to testify that at birth defendant was an "Rh factor" baby and therefore required three blood transfusions, administered through a vein in his head. Based on that evidence, defense counsel in argument discussed defendant's "struggle for life . . . from his first breath" and asserted that no one "can foresee or determine what damage was done because of it."

Defendant's mother testified over objection that he "tried to get into the service" but was rejected as asthmatic. She was then asked whether he showed "any displeasure or feelings about not getting into the service," and an objection was improperly sustained. Later, however, counsel referred to this evidence in arguing that defendant "suffered to a certain extent disappointment in his life."

Finally, an objection was sustained to a question put to defendant's former wife, Sybil D., as to whether she thought defendant should receive the death penalty. The question should have been allowed, since the answer would have exemplified the feelings held toward defendant by a person with whom he had had a significant relationship. A prior witness with whom defendant also had been romantically involved, however, was allowed to testify that she felt defendant should not receive the death penalty because "the Lord has got a plan for him." Moreover, Sybil D.'s testimony as a whole was generally so supportive of defendant that it is very unlikely that any juror would infer that she would want to see him put to death.

No prejudice resulted from these rulings and they do not constitute ground for reversal.

### XXV. Prosecutorial Misconduct in Closing Argument

Defendant claims prejudice from improper closing argument. He contends that such prejudice was exacerbated by the omission from the penalty phase instructions of the statements that arguments of counsel are not evidence and are to be disregarded if unsupported by the evidence, coupled with the inclusion in the penalty phase instructions of this language from CALJIC No. 8.84.2: "After having heard all of the evidence, and *after having heard and considered the arguments of counsel,* you shall consider,

take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed." (Italics added.)

The only part of the closing argument to which defense counsel objected at trial was as follows: "None of those women that you saw in this courtroom will ever forget Lee Heishman. What really struck me as I saw those women testify here is the permanence of what he did to them. I prosecuted a number of rape cases and I've seen the trauma and the anxiety and the anguish that women go through after a rape, but this is the first time I've ever really seen so graphically how deep those scars run and how long they last." The objection was overruled.

In contending this ruling was error, defendant relies on rules evolved to restrain prosecutorial arguments at trials of guilt. ■ Although a prosecutor may state his opinion formed from deductions made from evidence introduced at the trial, he or she may not express a personal opinion as to guilt if there is substantial danger that a juror will interpret it as being based on information not in evidence. Further, the prosecutor is prohibited from stating or implying facts for which there is no evidence before the jury. (*People* v. *Bain* (1971) 5 Cal.3d 839, 847-848 [97 Cal.Rptr. 684, 489 P.2d 564]; *People* v. *Kirkes* (1952) 39 Cal.2d 719, 723-724 [249 P.2d 1].)

■ Here it was proper for the prosecutor to comment upon the effect of defendant's alleged violent criminal acts upon the victims thereof, since "at the penalty phase the jury decides a question the resolution of which turns not only on the facts, but on the jury's moral assessment of those facts as they reflect on whether defendant should be put to death." (*People* v. *Haskett* (1982) 30 Cal.3d 841, 863 [180 Cal.Rptr. 640, 640 P.2d 776].) Defendant contends, however, that it was error for the prosecutor to refer to his own experience in prosecuting other "rape cases" in describing and evaluating the traumatic consequences of defendant's crimes. But his argument did not purport to rely on that experience as a basis for enlarging the perceived amount of trauma the victims must have suffered; instead he asserted that "this is the first time I've ever really seen" the depth and permanency of that trauma. Thus, his assessment of their suffering was based wholly on his observation of witnesses who had been observed also by the jury. Accordingly, no impropriety resulted. (*People* v. *Green, supra,* 27 Cal.3d 1, 35; *People* v. *Beivelman* (1968) 70 Cal.2d 60, 76-77 [73 Cal.Rptr. 521, 447 P.2d 913].)

For the same reason, there was nothing improper about another passage in the prosecutor's argument to which defendant now objects: "Why was that evidence brought in? Well, that is simply an attempt to generate some

kind of sympathy on your part for Lee Heishman. Maybe you can find some place in your heart to feel sorry for him. I certainly can't. What was really striking is that that was the best they could do. That was the best that the defense had. From 32 years of life, that was the very best that they could present that anybody could say about Lee Heishman's life. I frankly can't find one single factor from any of that testimony that weighs in mitigation. All of the evidence I heard goes into the balance against him."

The prosecutor here was merely drawing his own not unreasonable inferences from the evidence, which he was entitled to do. (*People* v. *Beivelman, supra,* 70 Cal.2d at pp. 76-77.) Thus, the argument would not have been a basis for claiming error on appeal even if defendant had objected to it at trial, which he did not.

Defendant further complains of the following prosecutorial argument, to which defense counsel did not object at trial: "You know, all of those women have children now. As they raise those children, as their daughters get older, do you think they're going to think about that every time their daughters leave the house at night? You know, it occurred to me as those women testified here that Lee Heishman imposed a life sentence of fear on each one of those women. Those were just the women who were able to testify here."

Defendant criticizes this argument as not based on facts in evidence. But it is, for the most part. Four out of the five victim-witnesses did testify that they had children. The implication that there were other victims who had not testified was properly based on the evidence of defendant's having been convicted of raping or sexually assaulting three such other victims. The factual discrepancies between the argument and the evidence, i.e., that one of the witnesses did not testify she had children, and that the gender of the others' children had not been established, could have been rendered completely harmless by a prompt curative instruction had defendant's attorney objected. Hence, defendant cannot complain of error now. (*People* v. *Fosselman, supra,* 33 Cal.3d 572, 581; *People* v. *Green, supra,* 27 Cal.3d 1, 34.)

Defendant also complains of argument calling attention to the expressions on defendant's face while he was in the courtroom: "I noticed during the testimony of a number of the women who testified here that a lot of you looked at Lee Heishman. When you looked at him in his face, did you see a trace of remorse? Did you see a trace of regret? When [full names of the five victim-witnesses] testified here, did you see regret and remorse in Lee Heishman's face? You could look and you could look and you won't find it, because it's not there." The prosecution further said: "Remember the face

of Lee Heishman while they testified here and remember all of the anger and the hatred in that face while those women testified."

Defendant did not object to this argument at trial; hence, he cannot claim it as error on appeal unless the trial court could not have cured the resulting harm by prompt admonition to the jury. (*Ibid.*) Defendant argues, first, that the argument was improper because it invoked, in aggravation, a lack of remorse on the part of defendant. As indicated earlier, however, defendant put the question of his remorse in issue through the testimony of his sister and Chaplain Morrison; thus, the prosecutor was free to base an argument on it even though it is not a statutory aggravating factor. (*People* v. *Boyd, supra,* 38 Cal.3d 762, 776.)

Next, defendant objects to the references, in this argument, to the expressions on defendant's face. ▓▓ In criminal trials of guilt, prosecutorial references to a nontestifying defendant's demeanor or behavior in the courtroom have been held improper on three grounds: (1) Demeanor evidence is cognizable and relevant only as it bears on the credibility of a witness. (2) The prosecutorial comment infringes on the defendant's right not to testify. (3) Consideration of the defendant's behavior or demeanor while off the stand violates the rule that criminal conduct cannot be inferred from bad character. (*People* v. *Garcia* (1984) 160 Cal.App.3d 82, 90-92 [206 Cal.Rptr. 468]; *United States* v. *Pearson* (11th Cir. 1984) 746 F.2d 787, 796; *United States* v. *Carroll* (4th Cir. 1982) 678 F.2d 1208; *United States* v. *Wright* (D.C. Cir. 1973) 489 F.2d 1181, 1185-1186 [160 App.D.C. 57].) ▓▓ But here, the prosecutor's references to defendant's facial demeanor were made at a penalty trial in which defendant had placed his own character in issue as a mitigating factor. Under those circumstances it was proper for the jury to draw inferences on that issue from their observations of defendant in the courtroom and therefore proper for the prosecutor to base a closing argument on such observations.

▓▓ Finally, defendant argues that it was prejudicial error for the prosecutor to refer to defendant's future dangerousness if he should be spared the death penalty and allowed to return to prison for the rest of his life.

The prosecutor said that "[i]f you put him back in prison for a life term, he will refer to the same patterns you've heard described by Bill Dorrity and Bob Scott: play the same old games for as long as he's there. Only this time with a lot more women staff and employees around. He will be just as manipulative as he's always been, and he'll tell people how he's changed." Dorrity and Scott are prison guards, and the "games" which they described are not rape, but attempting to manipulate people, especially women, by pretending to reform when in fact defendant feels no remorse. There was

ample evidence of defendant's "games," and in this context the lack of evidence of women guards at state prisons other than DVI is hardly a significant matter.

We perceive no ground for reversal. The prosecutor did not rely on any expert prediction of dangerousness (as in *People* v. *Murtishaw, supra,* 29 Cal.3d 733, 767) and the comment, being founded on evidence, was proper. (*People* v. *Davenport, supra,* 41 Cal.3d 247, 288.)

XXVI. CLAIMED DENIAL OF IMPARTIAL AND REPRESENTATIVE JURY

Defendant contends that because a number of prospective jurors who had expressed opposition to the death penalty were rejected even though they had given no indication they could not be fair and impartial in determining his guilt or innocence, he was denied a jury representative of the community. We have repeatedly rejected that contention. (*People* v. *Ghent, supra,* 43 Cal.3d 739, 753; *People* v. *Balderas, supra,* 41 Cal.3d 144, 191; *People* v. *Chavez, supra,* 39 Cal.3d 823, 827; *People* v. *Anderson* (1985) 38 Cal.3d 58, 60 [210 Cal.Rptr. 777, 694 P.2d 1149]; *People* v. *Zimmerman* (1984) 36 Cal.3d 154, 161 [202 Cal.Rptr. 826, 680 P.2d 776]; *People* v. *Fields* (1983) 35 Cal.3d 329, 353 [197 Cal.Rptr. 803, 673 P.2d 680] [plur. opn.], 374-375 [conc. opn. of Kaus, J.].)

Defendant also claims that the exclusion of the same prospective jurors made the jury substantially more likely to convict him than if such exclusions had not occurred, and therefore not neutral and impartial. In *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 68-69 [168 Cal.Rptr. 128, 616 P.2d 1301], this court concluded that it did not have a sufficient evidentiary basis on which to decide that juries that are "death-qualified" under California law are not neutral toward issues determinative of guilt. Defendant relies only on the data presented in *Hovey*; hence, his present contention is foreclosed by that decision. (*People* v. *Anderson, supra,* 38 Cal.3d 58, 60.)

Moreover, it is now settled that in capital cases, the exclusion for cause of jurors who would automatically vote against imposition of the death penalty does not deprive the defendant of any federal constitutional right to an impartial jury or to a jury representative of a cross-section of the community. (*Lockhart* v. *McCree* (1986) 476 U.S. 162 [90 L.Ed.2d 137, 106 S.Ct. 1758].)

### XXVII. Failure to Make Independent Determination of and to State Reasons for Denying Automatic Application for Modification of Penalty

██ Defendant contends the court erred in failing to state its reasons for denying his automatic application for modification of the death sentence. In this defendant is correct.

Section 190.4, subdivision (e) (hereafter section 190.4(e)), provides for an automatic application for modification, under section 1181, subdivision 7, of any verdict or finding imposing the death penalty. Section 190.4(e) further provides: "In ruling on the application, the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings. [¶] The judge shall set forth the reasons for his ruling on the application and direct that they be entered on the Clerk's minutes. The denial of the modification of the death penalty verdict pursuant to subdivision (7) of Section 1181 shall be reviewed on the defendant's automatic appeal pursuant to subdivision (b) of Section 1239. The granting of the application shall be reviewed on the People's appeal . . . ."

At the postverdict sentencing hearing, defendant made a motion for new trial, based on claimed trial errors, and a motion for discovery of the factors the trial court intended to rely on in ruling on the automatic application for modification of sentence. Both motions were denied. The judge then said: "[L]et me tell you how the Court feels about this personally: There was a long trial in this court, and the jury found the defendant guilty of first-degree murder. Then there was a penalty phase, and the jury came back with a definite mandate to the Court, asking and suggesting and recommending and actually naming the death penalty in this case. Now, under the circumstances, there not being any legal cause why this Court should set aside that, it is the Court's intention to go ahead and to impose the sentence, as mandated and as requested by the jury." The judge thereupon formally pronounced a sentence of death.

At the conclusion of the sentencing pronouncement, the prosecutor asked to approach the bench. According to an order settling the record on appeal, the prosecutor then "indicated that he believed the judge should indicate on the record that he (the judge) had reached the same conclusion as the jury, and independently, namely, that a death sentence was appropriate. Defense counsel made no comment . . . ." Back on the record, the judge stated as

follows: "Well, with respect to the entire sentence, the Court has followed its duties under Section 190.4(e) and has made a determination as to whether or not the jury's findings on the verdicts that [as to?] the aggravating and mitigating circumstances [are?] contrary to the law of [or?] the evidence presented, it is the Court's feeling, after considering and hearing all of the evidence, that the aggravated [sic] circumstances in this case most certainly do outweigh the mitigating circumstances." No reasons for the court's ruling are stated in the clerk's minutes of the hearing.

Although the judge's initial sentencing statement left doubts whether he had independently reviewed the evidence and determined that the verdict was not contrary to the evidence or the law, his later statement in response to the prosecutor's suggestion made clear that he did in fact make that independent review and determination as required by section 190.4(e). It is equally as clear, however, that the judge failed to comply with the statutory mandate to "state on the record the reasons for his findings" and to "set forth the reasons for his ruling on the application and direct that they be entered on the Clerk's minutes" (§ 190.4(e)). Since we have found no reversible error in the proceedings otherwise, we must determine the impact upon the judgment of death of this failure by the judge to record his reasons.

In *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 792-795, we remanded the case to the trial court for a new section 190.4(e) hearing not only because of the lack of any statement of reasons but also because the judge expressly declined to determine whether in his independent judgment the weight of the evidence supported the death penalty verdict. In contrast to *Rodriguez,* the present record shows that the trial judge did undertake to make a proper independent determination, under section 190.4(e), that the death sentence was not contrary to the evidence or the law. The question, therefore, is whether a remand is necessary solely on account of the judge's failure to state his reasons for his determination.

Unfortunately, the trial judge is no longer alive. If he were, we would remand for a new hearing on the verdict-modification application simply out of an abundance of caution, since the trial judge's familiarity with the record would enable him to review the application and state reasons for his determination with relatively little delay and expenditure of judicial resources. But since the trial judge is deceased, we consider whether his failure to state his reasons under section 190.4(e) so prejudiced defendant under the circumstances of this case as to necessitate reversal as to penalty. We conclude that there was no such prejudice.

In *People* v. *Chi Ko Wong* (1976) 18 Cal.3d 698 [135 Cal.Rptr. 392, 557 P.2d 976], we were faced with the failure of the juvenile court to state

reasons for its determination that a minor, charged with murder and robbery, was not a fit and proper subject to be dealt with under the Juvenile Court Law and therefore should be tried as an adult (Welf. & Inst. Code, former § 707). Though we deemed a statement of reasons to be constitutionally required under both United States Supreme Court decisions and a statutory revision that took effect after the juvenile court's determination, we held the error harmless and therefore affirmed convictions of first degree murder and robbery, explaining as follows: "[The] defendant had the benefit of a hearing, he was represented by counsel who had the opportunity to argue against the probation officer's recommendation, and he was not prejudiced by an improper evidentiary record. Thus, although the failure to make a statement of reasons for denying juvenile court retention was an error of constitutional dimensions, we conclude that in light of the overwhelming evidence supporting the probation officer's recommendation and the finding of the juvenile court referee, the failure to make such a statement of reasons was harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].)" (18 Cal.3d at pp. 722-723.)

If the trial judge's error in failing to state reasons for denying juvenile court retention in *Chi Ko Wong* was harmless, the trial judge's failure to state reasons under section 190.4(e) here clearly does not necessitate our disturbing the present judgment. Even if, though we do not so decide, the strict *Chapman* standard is applicable, there is no reasonable possibility the omission affected the judgment in this case. Here, as in *Chi Ko Wong,* defendant was fully heard through counsel on an evidentiary record which was free from prejudicial error. Moreover, the evidence that the aggravating circumstances outweighed the mitigating circumstances was so overwhelming that there is no reasonable possibility that a statement of reasons would have altered the trial judge's conclusion or revealed reversible error. (Cf. *People* v. *Porter* (1987) 194 Cal.App.3d 34, 39 [239 Cal.Rptr. 269]; *People* v. *Preyer* (1985) 164 Cal.App.3d 568, 577 [210 Cal.Rptr. 807]; *People* v. *Swanson* (1981) 123 Cal.App.3d 1024, 1033-1034 [176 Cal.Rptr. 915]; *People* v. *Blessing* (1979) 94 Cal.App.3d 835, 838-839 [155 Cal.Rptr. 780].) We turn to a review of that evidence.

Three aggravating factors were present: (1) the circumstances of the present crime and special circumstance (intentional killing of a witness to a crime to prevent her from testifying) (§ 190.3, factor (a), § 190.2, subd. (a)(10)); (2) defendant's prior criminal activity involving the use, attempted use, or express or implied threat to use, force or violence (§ 190.3, subd. (b)); and (3) defendant's prior felony convictions (§ 190.3, factor (c)).

We consider the first factor: Defendant murdered Nancy Lugassy to prevent her from testifying against him in a prosecution for raping her.

After learning of this prosecution, he induced Nancy Gentry and Cheryl Miller to assist him in stalking the victim. At his behest, Gentry deceived Lugassy into believing Gentry was a police representative performing a security check and thereby lured Lugassy outside into the dark where defendant was lying in wait with a gun. He immediately killed her with three bullets, and because she was no longer available to testify, the rape charge was dropped. Thus, the murder was elaborately planned; it was committed with a firearm; its purpose was to obstruct justice by insulating defendant from a prosecution for rape; defendant influenced others to participate in the murder; and the victim was led into a death trap by a betrayal of her trust in defendant's accomplice, Gentry, who led Lugassy to believe Gentry was a police officer.

The other two aggravating factors, violent criminal activity and prior felony convictions, are considered together because the dates of defendant's sexual assaults on women, together with the periods he was incarcerated for the commission of felonies and thus restrained from such misconduct, demonstrate a pattern of criminality. He raped Melody C. in June 1968 and Patrice S. in July 1968. On July 2, 1969, he pleaded guilty to the latter rape. On July 29, 1969, while awaiting sentence, he attempted to rape Maria M. On December 19, 1969, he was placed on three years probation for the rape conviction, and ordered to spend the first year in the county jail. He was released from jail in August 1970.

In January 1971, he was arrested on charges of committing three crimes, each against a different victim: a rape in October 1970, a burglary-rape in November 1970, and an attempted rape in November 1970. None of the victims testified at the present trial. He was convicted of those crimes by jury verdict in April 1971 and was committed to state prison. He remained in prison at Vacaville until December 1974, when he was released on parole.

In July 1975 he raped Lori H. In October 1975 he pleaded guilty to attempted rape and was returned to state prison. In February 1976 he was transferred to the prison at Tracy (DVI), from which he was released on parole in July 1977. In July 1978, he was discharged from parole, and in April 1979 he raped Tammy Q. In July 1979 he had his initial encounter with Nancy Lugassy in which he allegedly raped her. He murdered her on November 1, 1979, and was arrested on February 13, 1980.

The only mitigating circumstances claimed by defendant pertain to his character and background and so should be considered as part of the expanded factor (k) (§ 190.3, factor (k); *Easley, supra,* 34 Cal.3d at p. 878, fn. 10). None of the other statutory mitigating factors (see § 190.3, factors (d)-(j)) are even arguably present. Defendant was born in June 1948 and so was

31 at the time of the murder. There is no evidence that his criminal conduct was affected by mental or emotional disturbance, mental disease or defect, or intoxication. He was an Rh factor baby, requiring blood transfusions; at about age 17 he understandably became very upset from discovering the body of his grandmother who had hanged herself in a closet; and he was rejected for military service as asthmatic. There is no showing, however, that any of those incidents affected his capacity for self-control when he committed the murder or any of his prior crimes.

Six women testified for defendant at the penalty trial. Three were relatives: his mother, sister, and great-aunt. Another was his former wife, who married him in prison even though she knew he was there because of sexual assaults committed while she was dating him. After bearing their child, she terminated the marriage and refused to let defendant visit the child or pay child support. The other two women dated defendant, one from May 1978 through the summer of 1979 and the other from after the murder until his final arrest. Two short-term employers testified that defendant was a satisfactory worker despite tardiness and absences. There was testimony by two correctional officers that he was a model inmate at DVI, where he worked as a skilled butcher.

Defendant's sister testified that defendant expressed great remorse for his prior acts during group therapy sessions in prison at Vacaville. Yet following his release from Vacaville, his commission of another rape, and his reimprisonment, he insisted he had been framed and expressed no remorse, according to the DVI correctional officers. Finally, a jail chaplain testified that after defendant's arrest for the Lugassy murder defendant expressed great remorse over his past and became a real Christian as opposed to a jailhouse convert.

None of this evidence offered in mitigation offset, to any significant extent, the overwhelming aggravating circumstances: defendant's history of repeated callous brutality toward women, culminating in the carefully planned, cowardly murder of a victim who sought to bring him to justice. His proved ability to be a productive worker and to inspire supportive responses from family and friends seems to have had little or no restraining effect on his continuing course of irresponsible and despicable conduct.

The trial judge's reasons for determining the jury's verdict of death was not contrary to the evidence or law are self-evident, and therefore defendant was not prejudiced by the judge's failure to state reasons for denying defendant's automatic application for modification of the verdict imposing the death penalty.

## XXVIII. Request to Give Trial Court Opportunity to Strike Special Circumstance

Section 1385 provides: "The judge or magistrate may, either of his or her own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed." In *People* v. *Williams* (1981) 30 Cal.3d 470 [179 Cal.Rptr. 443, 637 P.2d 1029], the defendant was convicted of first degree murder with the special circumstances that the murder was committed during commission of a robbery and burglary. The prosecutor did not seek the death penalty, and the defendant was sentenced to life imprisonment without possibility of parole. At the sentencing hearing, the trial court stated that because the defendant was substantially less culpable than her accomplice, it would prefer to dismiss the special circumstances, but that it believed it had no power to do so. This court held that the trial court did have such dismissal power under section 1385 and remanded the case "for exercise of the court's discretion to determine whether or not there is a basis for dismissing the finding of two special circumstances." (*Id.* at p. 492.) But the court added this limitation to its holding: "No view is expressed on whether the power to dismiss under section 1385 applies to a finding of special circumstances after the jury has returned a verdict of death." (*Id.* at p. 490, fn. 11.)

Notwithstanding that limitation, defendant asks that we now give the trial court an opportunity to dismiss the special circumstance pursuant to section 1385. Defendant points out that *Williams* was not filed until after he was sentenced.

Even assuming that a power to dismiss a special circumstance survives a jury verdict imposing the death penalty, we would deny defendant's present request. Defendant offers no reason why any discretion should be exercised in favor of dismissing the special circumstance found against him. From the trial judge's refusal to modify the death penalty, based on his independent determination "that the aggravated (*sic*) circumstances in this case most certainly do outweigh the mitigating circumstances," coupled with the overwhelming aggravating circumstances already discussed, we conclude that the court would not have dismissed the special circumstance even if it had believed it had the power to do so. (See *People* v. *Zimmerman, supra,* 36 Cal.3d 154, 159, fn. 2.)

The judgment is affirmed.

Lucas, C. J., Broussard, J., Panelli, J., Arguelles, J., and Eagleson, J., concurred.

MOSK, J.,—I concur in the affirmance of the judgment as to guilt and in the sustaining of the special circumstance finding.

I dissent, however, from the affirmance of the judgment as to penalty. I agree with the majority that the trial judge erred when he failed to state his reasons for denying defendant's automatic application for modification of the verdict of death under Penal Code section 190.4, subdivision (e) (hereafter section 190.4(e)).

But I cannot agree that this error can be held harmless. In *People* v. *Rodriguez* (1986) 42 Cal.3d 730 [230 Cal.Rptr. 667, 726 P.2d 113], we concluded that "failure to specify reasons for denying modification sufficient 'to assure thoughtful and effective appellate review[ ]'" was fatal. (*Id.* at p. 794.) The reason is plain: we cannot undertake the kind of review the Constitution requires when a man's life is at stake if all we can look to in the record is a void.

In holding that the error here is subject to harmless-error analysis, the majority rely on *People* v. *Chi Ko Wong* (1976) 18 Cal.3d 698 [135 Cal.Rptr. 392, 557 P.2d 976]. Their reliance, however, is misplaced. In *Chi Ko Wong*—which as the majority themselves recognize was not a capital case— the court did not consider, less still decide, whether failure to state reasons for denying a section 190.4(e) application could be deemed harmless. It is settled, of course, that a case is not authority for a proposition not considered. (E.g., *People* v. *Gilbert* (1969) 1 Cal.3d 475, 482, fn. 7 [82 Cal.Rptr. 724, 462 P.2d 580]; *In re Tartar* (1959) 52 Cal.2d 250, 258 [339 P.2d 553].) In any event, to the extent that *Chi Ko Wong* can be read to support the majority's position, in light of *Rodriguez* it is no longer good law.

Further, I do not believe this court can somehow "cure" the error by attempting to redetermine the application itself. Section 190.4(e) provides in relevant part as follows. "In ruling on the application, *the judge* shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances . . . , and shall make a determination as to

whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. *The judge* shall state on the record the reasons for his findings. [¶] *The judge* shall set forth the reasons for his ruling on the application and direct that they be entered on the Clerk's minutes." (Italics added.)

On its face, section 190.4(e) plainly gives the determination of an application for modification of the verdict of death to *the trial judge* and *the trial judge alone*—not to any judge or to the trial court as a body, and certainly not to an appellate judge or an appellate court. The reason for this is evident: the Constitution imposes a requirement of heightened reliability for a verdict of death; only the trial judge has had the opportunity to observe the demeanor of the witnesses and of the defendant himself; therefore, it is only that judge who can make a constitutionally adequate determination as to whether the defendant should be sentenced to death in accordance with the verdict.

In this case, the trial judge is deceased. Therefore, we have only two valid alternatives. The first is to exercise our authority under Penal Code sections 1181, subdivision 7, and 1260, and reduce the sentence from death to life imprisonment without possibility of parole while at the same time affirming the judgment of guilt. (E.g., *People* v. *Lucero* (1988) 44 Cal.3d 1006, 1034-1036 [245 Cal.Rptr. 185, 750 P.2d 1342] (conc. & dis. opn. of Mosk, J.) [concluding in a capital case that the judgment of guilt should be affirmed but that the sentence of death should be reduced to life imprisonment]; cf. *People* v. *Jackson* (1955) 44 Cal.2d 511 [282 P.2d 898] [reversing a judgment with directions to the trial court to reduce a death penalty to life imprisonment in a case in which serious errors were committed but the overwhelming weight of credible evidence established guilt].) In the unusual circumstances presented by this case, such a procedure would serve the ends of justice and also avoid the necessity of conducting another penalty trial more than eight years after commission of the crime.

The second alternative is to reverse the judgment as to penalty and to return the matter for a new penalty trial. If, after more than eight years, the prosecution experiences difficulty in producing witnesses and evidence, it may elect to stipulate to life imprisonment without possibility of parole as the punishment for defendant.

For the reasons stated above, I cannot join in the majority's conclusion that the trial judge's failure to state his reasons for denying defendant's

section 190.4(e) application can be deemed harmless error. Accordingly, I dissent from the affirmance of the judgment as to penalty.

Appellant's petition for a rehearing was denied June 30, 1988, and the opinion was modified to read as printed above. Mosk, J., was of the opinion that the petition should be granted.