Filed 4/29/26  P. v. Cudjo CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B337977 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. XNOMA082999) |
| v. | |
| GREGORY PAUL CUDJO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kathleen Blanchard, Judge. Affirmed.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In 1986, defendant Gregory Paul Cudjo and his brother Armenia Cudjo burglarized the Prokuda residence while Amelia Prokuda and her five-year-old son Kevin Prokuda were home.[1] After Armenia raped Amelia, Gregory tied her up and bludgeoned her to death with a fireplace poker and a hammer. Gregory now appeals his conviction for first degree murder. Because we perceive no error, we affirm.

## FACTUAL BACKGROUND

In March 1986, Gregory and Armenia lived together in a cab-over camper in a desert lot in the Antelope Valley.[2] They were cocaine users but did not have money to afford it.

On the morning of March 21, 1986, the brothers planned a burglary to obtain valuables that they could then sell. They chose the nearby Prokuda house, which appeared to be unoccupied. They entered through the open garage at the back of the house. After they encountered a locked door in the garage, Gregory used a survival knife to "jimmy the lock" and open the door.

Behind the door was Amelia. As Gregory grabbed Amelia, Armenia ducked down out of sight. Gregory continued into the house with Amelia while holding the survival knife to her neck and demanding money. As he did so, he found Kevin standing next to Amelia. Gregory then led Amelia and Kevin down a hallway, directed Kevin into a bedroom, and closed the door.

Gregory next led Amelia to the living room, where Armenia joined them. Gregory handed Amelia off to Armenia and searched

---

[1] We refer to individuals who share the same last names by their first names for clarity. We intend no disrespect.

[2] In reciting this summary, "we 'view the evidence in the light most favorable to the jury verdict.' " (*People v. Navarro* (2021) 12 Cal.5th 285, 302.)

the house for valuables. In the living room, Armenia raped Amelia. After this, Gregory returned with various items and two long rifle cases.

As the brothers were about to leave, Gregory took Amelia to a bedroom to tie her up. Armenia, who remained in the living room, heard scuffling noises coming from the bedroom. Thinking Gregory might need help, Armenia grabbed a fireplace poker and went into the bedroom. There, Gregory stood over Amelia, who was face down, had her mouth gagged, had something tied around her head, and had her hands tied behind her back. Annoyed that Amelia was resisting, Gregory grabbed the poker from Armenia, hit Amelia twice in the head with it, and repeatedly said, "Bitch, be still." The second strike was so forceful the tip of the poker broke.

After the second strike, Armenia left the room and heard Gregory strike Amelia a third time with the poker. Armenia also heard four loud thud sounds and several quieter thud sounds.[3] A few minutes later, Gregory exited the bedroom and said Amelia had been "acting up" and he "knocked her out and tied her up."

The brothers then left the Prokuda house using separate routes. Gregory took the northwestern path through the desert, which left footprints in the sand. Armenia took the eastern path on a paved road, which did not leave footprints. They both returned to their camper. That afternoon, deputies from the Los Angeles County Sheriff's Department (LASD) arrested the brothers at the camper.

---

[3] No one witnessed what caused these sounds. However, a claw hammer with blood on it was found next to Amelia's body. The People theorized the thuds were the sound of Gregory hitting Amelia with the hammer.

A medical examiner performed an autopsy and found that Amelia died of blunt force trauma. The examiner identified 16 scalp lacerations as the minimum number of blows dealt to Amelia's head. He opined the actual number was probably substantially higher.

## PROCEDURAL BACKGROUND

### I. Armenia's 1988 Conviction

In 1986, the LASD believed only one person broke into the Prokuda home. Kevin testified he saw only one intruder, and although the deputies found two set of footprints heading toward the general direction of the Prokuda house and numerous footprints around the house, they only found one set of footprints heading away from the house.

LASD arrested the brothers, who looked similar and wore similar clothing on March 21, 1986. They shared the same weight and height. They wore the same model and size of MacGregor shoes. They wore similarly colored blue shorts. The difference was Armenia's semen was found at the crime scene.

In 1986, Armenia was charged with Amelia's murder. In 1988, Armenia was convicted of special circumstances first degree murder and sentenced to death, which our Supreme Court affirmed on direct appeal. (*People v. Cudjo* (1993) 6 Cal.4th 585, 637.)

In 2012, the Ninth Circuit overturned Armenia's conviction and death sentence on the ground that evidence that Gregory had confessed to the crime had been improperly excluded. (*Cudjo v. Ayers* (9th Cir. 2012) 698 F.3d 752, 770.)

### II. Gregory's Confessions

Between 1986 and 2012, Gregory confessed to multiple people that he murdered Amelia.

4

First, in 1986, Gregory confessed to family friend John Culver. After Gregory was arrested at the camper, he was coincidentally placed in the same cell as Culver. Seeing Gregory was pacing back and forth, Culver asked what was wrong. Gregory replied he was arrested for murder and admitted he was the culprit. Gregory said, "I went over to rob, burglarize this lady's house, and she seen me, and that's when all the stuff went down, and that's what happened." Gregory also said he knocked Amelia out after she started screaming and continued to beat her with a hammer after she was unconscious.

An officer overheard that conversation and prepared a report stating "Suspect Cudjo" said "I'm in here for murder and I did it." To aid Armenia's Ninth Circuit appeal, Gregory prepared declarations in 2008 identifying himself as the person who said, "I'm in here for murder and I did it."

Second, in 1988 or 1989, Gregory confessed to his best friend's nephew Shontae Franklin. Gregory and Franklin were waiting outside a convenience store when they saw a man who had attempted to kill Franklin's mother. Gregory said the man was a bad person and "has bodies out here like me." Gregory added, "My brother's in jail for a white girl that I killed."

Third, in 1991 or 1992, Gregory confessed to his best friend Steven Davison. The two men were hanging out in Davison's van when Gregory said, "I feel bad. I never did tell nobody about this, but my brother Armenia is the one that's in prison, and I'm the one that did the crime that Armenia is in prison for."

Finally, in 2000, Gregory confessed to LASD Sergeant Brian Jones. While Jones was on duty, Gregory came into the station and asked a community service officer why two detectives were looking for Gregory. Gregory told the officer he thought it might be related to a homicide. Jones then spoke to Gregory, who said someone else was in jail for a homicide the person did not

commit. When Jones asked Gregory how he knew this, Gregory answered he was involved in the homicide.

### C.     Gregory's 2024 Trial and Conviction

After the Ninth Circuit overturned his conviction, Armenia confessed to raping Amelia but accused Gregory of killing her. Because Armenia's confession corroborated Gregory's confessions, which had been obtained by the LASD over the years, Gregory was charged by an amended information with Amelia's murder. (See Pen. Code, § 187, subd. (a).[4]) The information further alleged Gregory used a deadly and dangerous weapon within the meaning of section 12022, subdivision (b)(1).

Armenia was separately charged, for a second time, with first degree murder. He pled no contest and was sentenced to 25 years to life.

Gregory was tried by a jury in March 2024. Gregory's sole defense was the LASD got it right the first time. He argued Armenia, and only Armenia, burglarized the Prokuda house and killed Amelia.

The jury found Gregory guilty of first degree murder and found true the allegation he personally used a deadly and dangerous weapon. The trial court denied his motion for new trial. On May 10, 2024, he was sentenced to 26 years to life.

Gregory timely appealed. (See § 1237, subd. (a); Cal. Rules of Court, rule 8.308(a).)

### DISCUSSION

On appeal, Gregory makes two arguments that he never made before the trial court. First, he argues CALJIC Nos. 3.10 and 3.16, which defined accomplice and informed the jury that an accomplice's testimony must be corroborated, should have been

---

[4]     Undesignated statutory references are to the Penal Code.

modified to also say that an accomplice can also be the direct perpetrator of a crime. Second, he argues CALJIC No. 8.31, the implied malice second degree murder instruction, should have also been given to the jury.

The People argue Gregory forfeited these claims of instructional error by not requesting these instructions below. We assume he did not. (See *People v. Owen* (1991) 226 Cal.App.3d 996, 1004 ["In criminal cases, the trial court must instruct sua sponte on the general principles of law relevant to issues raised by the evidence . . . . At a minimum, the court must ensure that the jury is adequately instructed on the law governing all elements of the case submitted to it to the extent necessary for a proper determination in conformity with applicable law."].) We reject both contentions on the merits.

## I.  Standard of Review

We review claims of instructional error de novo. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581, 584.)

## II.  The Trial Court Did Not Err by Instructing the Jury With CALJIC Nos. 3.10 and 3.16 Without Modification

### A.  The Principal and Accomplice Jury Instructions

Gregory's jury received a number of instructions to guide their deliberations and decision making. Pertinent portions relating to liability were as follows:

CALJIC No. 2.90: "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places upon the People the burden of proving him guilty beyond a reasonable doubt."

7

CALJIC No. 3.00: "Persons who are involved in committing a crime are referred to as principals in that crime . . . . Principals include: [¶] 1. Those who directly and actively commit the act constituting the crime, or [¶] 2. Those who aid and abet the commission of the crime."

CALJIC No. 3.03: "The People have the burden of proving that the defendant was a principal in, and had not effectively withdrawn from participation in, that crime. If you have reasonable doubt that he was a principal in and participated as an aider and abettor in a crime charged, you must find him not guilty of that crime."

CALJIC No. 3.10: "An accomplice is a person who is subject to prosecution for the identical offense charged in Count 1 against the defendant on trial by reason of aiding and abetting."

CALJIC No. 3.11: "You cannot find a defendant guilty based upon the testimony of an accomplice unless that testimony is corroborated by other evidence which tends to connect the defendant with commission of the offense."

CALJIC No. 3.12: "To corroborate the testimony of an accomplice, there must be evidence of some act or fact related to the crime which, if believed, by itself and without any aid, interpretation or direction from the testimony of the accomplice, tends to connect the defendant with the commission of the crime charged. [¶] . . . [¶] In determining whether an accomplice has been corroborated, you must first assume the testimony of the accomplice has been removed from the case. You must then determine whether there is any remaining evidence which tends to connect the defendant with the commission of the crime. [¶] If there is no independent evidence which tends to connect defendant with the commission of the crime, the testimony of the

8

accomplice is not corroborated. [¶] If there is independent evidence which you believe, then the testimony of the accomplice is corroborated."

CALJIC No. 3.16: "If the crime of Murder was committed by anyone, the witness Armenia Cudjo was an accomplice as a matter of law and his testimony is subject to the rule requiring corroboration."

CALJIC 3.18: "To the extent that an accomplice gives testimony that tends to incriminate the defendant, it should be viewed with caution."

## B. The Accomplice Instructions Were Not Tantamount to a Directed Verdict for the People

As mentioned, Gregory's sole defense at trial was that Armenia alone broke into the Prokuda house on March 21, 1986. Gregory thus argued the only person who could have murdered Amelia, and did in fact murder her, was Armenia.

According to Gregory, CALJIC Nos. 3.10 and 3.16, given without modification, precluded the jury from accepting his theory. Gregory takes issue with CALJIC No. 3.10's language stating "[a]n accomplice is a person who is subject to prosecution for the identical offense charged in Count 1 against the defendant on trial *by reason of aiding and abetting*" and CALJIC No. 3.16's language stating "[i]f the crime of Murder was committed by anyone, the witness *Armenia Cudjo was an accomplice as a matter of law*." (Italics added.) Gregory contends that without any language that an accomplice can also be a director perpetrator, these instructions implicitly rejected his theory that Armenia acted alone because they effectively instructed the jury Armenia did in fact aid and abet Gregory in committing Amelia's murder.

9

Gregory thus claims these instructions were tantamount to a directed verdict that Gregory was the murderer. He argues an instruction like CALCRIM No. 334, which defines accomplice to be either a direct perpetrator or aider and abettor, would have been more appropriate.

However, as Gregory acknowledges, the California Supreme Court rejected similar claims of instructional error in *People v. Heishman* (1988) 45 Cal.3d 147 (*Heishman*), abrogated on other grounds by *People v. Diaz* (2015) 60 Cal.4th 1176, 1190, and *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, and we are bound by these precedents. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

In *Heishman*, the defendant was charged with murdering a woman to prevent her from testifying that he had raped her. (*Heishman*, *supra*, 45 Cal.3d at pp. 156–157.) Nancy Gentry, a woman with whom the defendant was romantically involved, testified she drove the defendant to the victim's home, lured the victim outside, and drove the defendant from the scene after the murder. (*Id.* at pp. 158–159.) The defendant argued at trial Gentry acted on her own and was the one who killed the victim. (*Id.* at p. 162.) The trial court instructed the jury with CALJIC Nos. 3.10 and 3.16, the language of which were similar to those given in Gregory's trial. (*Heishman,* at p. 162.)

In *Heishman,* on appeal following his conviction, the defendant argued that, because of CALJIC Nos. 3.10 and 3.16, the jury was "directed to find that Gentry was an accomplice in the sense of one who assists another and was precluded from finding that she acted alone." (*Heishman*, *supra*, 45 Cal.3d at p. 162.)

10

The Supreme Court rejected this argument and explained the instructions still allowed the jury to conclude Gentry was both an accomplice and the actual killer: "The instructions did not literally tell the jury it could not find Gentry was the killer. And Gentry was legally an accomplice 'if the crime of murder was committed by anyone' including Gentry herself. CALJIC No. 3.16 was given to make clear that Gentry was being labeled an accomplice for purposes of the rule requiring corroboration if her testimony were believed. The instruction could not reasonably be understood as precluding rejection of her testimony—including rejection based on a conclusion that in fact she was the killer. [Citation.] Defendant's interpretation of the instruction would make it practically a direction of conviction. Yet the jury was fully instructed on the presumption of innocence and the prosecution's burden of proving guilt beyond a reasonable doubt." (*Heishman*, *supra*, 45 Cal.3d at pp. 162–163.)

In *Coffman and Marlow*, defendants Coffman and Marlow were convicted of kidnapping, robbing, raping, and killing the victim. (34 Cal.4th at p. 16.) On appeal, Coffman argued that because CALJIC No. 3.10 defined accomplice only as aider and abettor and because the evidence clearly established Marlow was the direct perpetrator, the instructions precluded the jury from finding Marlow to be an accomplice. (34 Cal.4th at p. 103.) According to Coffman, this prejudiced her case by depriving her of the benefit of instructions stating an accomplice's testimony must also be corroborated by independent evidence. (*Id.* at p. 104.) Citing *Heishman*, the court held CALJIC No. 3.10 could not have misled the jury in the manner that Coffman claimed. (34 Cal.4th at p. 104.) Marlow also was entitled to the presumption of innocence, and CALJIC No. 3.10 did not direct

11

the jury to find Marlow was the direct perpetrator. (34 Cal.4th at p. 104.)

Here, the instructions similarly did not tell the jury Gregory was necessarily guilty. Instead, they left that fact-finding function to the jury. CALJIC No. 2.90 instructed the jury Gregory was presumed innocent and the People bore the burden of proving him guilty beyond a reasonable doubt. CALJIC No. 3.00 defined principal, and CALJIC No. 3.03 reminded the jury that the People bore the burden of proving Gregory was a principal in the charged crime. CALJIC No. 3.10 defined accomplice, and CALJIC Nos. 3.11, 3.12, 3.16, and 3.18 *benefited* Gregory by informing the jury it must view Armenia's testimony with caution, assume Armenia's testimony was removed from the case, and consider whether independent evidence connected Gregory with the commission of the murder. We presume the jury only considered Armenia's status as an accomplice for these purposes and concluded Gregory was guilty because the evidence supported that finding. (*People v. Barrett* (2025) 17 Cal.5th 897, 1028 ["We presume jurors follow their instructions."].)

Gregory first attempts to distinguish *Coffman and Marlow*. According to Gregory, the case is inapposite because there (1) it was obvious the two defendants were accomplices no matter who committed the killing, (2) the issue was whether the jury was precluded from applying the rule requiring corroboration of an accomplice's testimony, and (3) the jury was not instructed that Marlow was an accomplice as a matter of law. Although there are some differences between *Coffman and Marlow* and this case, *Coffman and Marlow* still compels us to reject Gregory's argument as it stands for the proposition that CALJIC No. 3.10

12

does not create a conclusive presumption that a defendant is a direct perpetrator.

As for *Heishman*, Gregory argues that to the extent it bars his "directed verdict" argument, *Heishman* does not preclude him from arguing that giving CALJIC Nos. 3.10 and 3.16 was still erroneous because these instructions, in the context of this case, were ambiguous, incomplete, and could have been interpreted by a juror as a judicial declaration that Armenia was an aider and abettor rather than direct perpetrator. This argument fails for several reasons.

First, although we are considering Gregory's claim of instructional error despite his failure to object below (see p. 7, *ante*), to the extent he is arguing the instructions were misleading rather than legally incorrect, he has forfeited the argument. "A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal." (*People v. Lee* (2011) 51 Cal.4th 620, 638.)

Second, assuming Gregory did not forfeit the argument, he provides no evidence or citation to the record to support his insinuation that the instructions misled the jury. He merely speculates the instructions *could* have done so. This is insufficient to demonstrate error. (See *Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277 [" 'When an appellant raises an issue "but fails to support it with reasoned argument and citations to authority, we treat the point as waived." ' "].)

Finally, in *People v. Morris* (1991) 53 Cal.3d 152, disapproved on other grounds by *People v. Stansbury* (1995)

9 Cal.4th 824, 830, footnote 1, the Supreme Court reaffirmed *Heishman* and rejected a similar contention that CALJIC Nos. 3.10 and 3.16 should be supplemented with an additional instruction that an accomplice can be a direct perpetrator. There, the trial court instructed the jury that two witnesses were accomplices as a matter of law and defined an accomplice as essentially an aider and abettor. (*Morris,* at p. 210.) The defendant argued the court's refusal to instruct the jury that "an accomplice could also be a person who 'directly' committed the crime" resulted in a conclusive presumption against his defense that two testifying accomplices "were the actual killers." (*Id.* at p. 211.) The Supreme Court followed its precedent in *Heishman* and rejected the claim that the proposed language was necessary. (*Ibid.*)

Because we find *Heishman*, *Carlow and Marlow*, and *Morris* dispose of Gregory's argument, we conclude the trial court did not err by instructing the jury with CALJIC Nos. 3.10 and 3.16 as they were given.

### III. The Trial Court Did Not Err by Not Instructing the Jury with CALJIC No. 8.31 Sua Sponte

#### A. Relevant Legal Principles and Jury Instructions

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) "Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder." (*People v. Knoller* (2007) 41 Cal.4th 139, 151.) Malice may be express or implied. (§ 188, subd. (a).) "The primary difference between express malice and implied malice is

14

that the former requires an intent to kill but the latter does not." (*People v. Soto* (2018) 4 Cal.5th 968, 976.) Implied malice murder instead requires the killing be proximately caused by an act, " ' " 'the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 988.)

Second degree murder, including express and implied malice murder, is a lesser included offense of first degree murder. (See *People v. Taylor* (2010) 48 Cal.4th 574, 623–624.) The trial court must instruct on lesser included offenses "if there is evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not of the lesser." (*People v. Blair* (2005) 36 Cal.4th 686, 744–745, overruled on other grounds by *People v. Black* (2014) 58 Cal.4th 912, 919.) "To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial—that is, it must be evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist." (*Blair,* at p. 745.)

Here, in addition to instructing the jury on first degree murder, the trial court also instructed the jury on express malice second degree murder with CALJIC No. 8.30: "Murder of the second degree is the unlawful killing of a human being with malice aforethought when the perpetrator intended to unlawfully

to kill a human being but the evidence is insufficient to prove deliberation and meditation."

**B.    There Was Insufficient Evidence to Require the Trial Court to Instruct on Implied Malice Second Degree Murder**

According to Gregory, the trial court should have also given the jury CALJIC No. 8.31, the implied malice second degree murder instruction. Not so. No reasonable jury could have concluded that whoever killed Amelia acted with conscious disregard for life instead of the intent to kill.

Although the parties disputed how many people broke into the Prokuda house on March 21, 1986, and who killed Amelia, there was no dispute as to why the burglary occurred and how Amelia was killed. It was undisputed an armed culprit broke into the Prokuda house as part of a plan to steal valuables that could be sold for cocaine. There was no dispute that during the commission of the burglary Amelia was taken captive, raped, and bound. It was undisputed after Amelia was rendered helpless and unable to resist, someone bludgeoned her to death with a fireplace poker and hammer. There was no dispute that one of the poker strikes was so forceful that the tip broke. It was undisputed *at least* 16 poker and hammer blows were dealt to Amelia's head. Under these circumstances, regardless of who the jury concluded killed Amelia, the jury could reasonably conclude that killer acted with the intent to kill.

Even Gregory concedes there was "strong evidence of intent to kill," including the evidence showing Amelia was repeatedly struck in the head and suffered multiple skull fractures and brain injuries. Nevertheless, he conclusorily asserts this did not negate the possibility that the person who inflicted these wounds

16

acted only with a conscious disregard for life, rather than the specific intent to kill. That does not demonstrate error. (Cf. *Jones v. Superior Court* (1994) 26 Cal.App.4th 92, 99 ["Issues do not have a life of their own: if they are not raised or supported by argument or citation to authority, we consider the issues waived."].)

Gregory further argues the jury was not required to accept Armenia's testimony that Gregory was the person who inflicted all the wounds while Armenia inflicted none of them. According to Gregory, if the jury concluded both brothers inflicted some of the blows and found Armenia inflicted the majority of them, the jury could have reasonably concluded Gregory did not act with the specific intent to kill. We are not persuaded.

Assuming the brothers bludgeoned Amelia to death together, this does not help Gregory. With her hands bound and mouth gagged, Amelia could not fight back or summon help. She was helpless and at the brothers' mercy. Regardless of how the number of blows was allocated, striking her head with a fireplace poker or hammer under these circumstances evinces an intent to kill.

Because instructing the jury with CALJIC No. 8.31 was not supported by substantial evidence, the trial court had no duty to do so.

Since we have found no error, we need not and do not consider the parties' harmless error or cumulative error arguments.

17

**DISPOSITION**

The judgment is affirmed.


RICHARDSON, J.


WE CONCUR:


CHAVEZ, Acting P. J.


GOORVITCH, J.*

---

*     Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.